Thomas Neal **WEAVER**, Appellant,

v.

The **STATE** of Texas, Appellee.

No. B14–92–00338–CR.

Court of Appeals of Texas, Houston (14th Dist.).

May 13, 1993.

**118**

Denise Collins, Houston, for appellant.

Dan McCrory, Houston, for appellee.

Before MURPHY, SEARS and
DRAUGHN, JJ.

## OPINION ON MOTION
## FOR REHEARING

DRAUGHN, Justice.

Appellant was found guilty of capital murder and sentenced to life imprisonment. In three points of error, appellant contends the trial court committed reversible error by: 1) denying appellant's putative common law wife the right to claim spousal privilege; 2) failing to submit a requested jury charge on the lesser included offense of aggravated assault, and; 3) making an affirmative finding of the use of a deadly weapon in the commission of the offense. We overrule points of error one and two, sustain point of error three and reform the judgment as it pertains to the deadly weapon finding, and affirm the judgment as reformed.

In July of 1991, appellant lived with his alleged putative wife, Allison Taylor, in a home owned by Dorothy Yeary. Yeary was an elderly woman confined to a wheelchair, and depended upon others for her daily care. Appellant and Taylor were allowed to live in Yeary's home in return for Taylor's care of her and the payment of the utilities.

On July 21, 1991, appellant left Taylor in their bedroom and entered Yeary's bedroom in search of money to buy cocaine. Yeary awoke and began calling for Taylor. Appellant struck Yeary on the head with a hammer, allegedly to prevent her from screaming. The blow did not silence her, however, and when she continued to call for Taylor, appellant strangled her with an extension cord. It was appellant's position throughout the investigation and the trial that he did not intend to kill Yeary, but only to render her unconscious so that she could not cry out.

In response to Yeary's cries, Taylor left her bedroom to determine what was wrong. However, appellant, from Yeary's bedroom, warned her that if she interfered, he would "hurt her too." Frightened, Taylor returned to her bedroom. Appellant then told Taylor to stay in the room and wait for him. He then left periodically to purchase

drugs. He subsequently returned to the house, spoke briefly with Taylor, and left again. During his second departure, Taylor called '911' to request that a policeman be dispatched to the residence. However, she refused the operator's request to go check on Yeary, even in appellant's absence, because she was frightened and also under the influence of cocaine at the time. A policeman was eventually sent to the residence several hours later, but did not investigate inside the house, due to his belief that whatever disturbance that had been reported had been resolved. This belief was based upon the failure of anyone to respond to his knocks or phone calls.

After Taylor had called '911', but before the officer arrived, appellant returned to Yeary's home. He forced Taylor to leave with him, and the two went to a motel where they consumed more cocaine. They checked into another motel several hours later, and appellant eventually contacted a policeman whom he knew, and voluntarily surrendered himself.

When the policemen arrived to escort appellant to headquarters, one of the officers immediately read appellant his rights. Appellant stated his desire to waive those rights and make a statement. The officer then directed appellant to the police car, and asked appellant if he would object to the statement being tape recorded. The appellant responded that he had no objections. The officer then read appellant his rights individually, and asked him after each one whether appellant understood. Appellant responded affirmatively after each, and expressed his desire to waive those rights and explain what had transpired. He then related the above facts about the incident. Upon reaching the police department, appellant again signed and initialed a written waiver of his rights and made a formal confession. He was subsequently indicted for capital murder, to which he pled "not guilty."

Point of error one presents a unique issue that has not been directly addressed by any court in this state. Appellant asserts that the trial court abused its discretion in refusing to allow appellant's putative common law wife to claim the spousal privilege not to testify against him.

Tex.R.Crim.Evid. 504 governs the issue of the husband-wife privilege in criminal trials. The rule states in pertinent part:

(1) Confidential communication privilege.

(a) *Definition.* A communication is confidential if it is made privately by any person to his spouse *and it is not intended for disclosure to any other person.* (emphasis added).

(b) *General rule of privilege.* A person, whether or not a party, or the guardian or representative of an incompetent or deceased person, has a privilege during their marriage and afterwards to refuse to disclose and to prevent another from disclosing a confidential communication made to his spouse while they were married.

(c) *Who may claim the privilege.* The privilege may be claimed by the person or his guardian or representative, or by the spouse on his behalf. The authority of the spouse to do so is presumed.

(2) Privilege not to be called as a witness against spouse.

(a) *General rule of privilege.* The spouse of the accused has a privilege not to be called as a witness for the state. This rule does not prohibit the spouse from testifying voluntarily for the state, even over objection by the accused. A spouse who testifies on behalf of an accused is subject to cross-examination as provided in Rule 610(b). Failure by an accused to call his spouse as a witness, where other evidence indicates that the spouse could testify to relevant matters, is a proper subject of comment by counsel.

(b) *Exceptions.* Except in a proceeding where the accused is charged with a crime committed during the marriage against the spouse, there is no privilege under this rule ... (2) as to matters occurring prior to the marriage.

Thus, the spousal privilege rule has two parts, one dealing with those communications to the spouse which were intended to be kept private, and the privilege for the spouse of the accused not to be called as a

witness at all. Appellant claims a privilege existed under both parts of the rule, as he alleges Taylor was his common law wife, and therefore, should not be called as a witness, and furthermore, any communications made to her were intended to be kept private.

We will first address 504(2) regarding whether or not Taylor could claim a privilege not to be called as a witness against appellant. Both appellant and Taylor alleged at trial that Taylor was appellant's common law wife. In a hearing outside the jury's presence, Taylor testified that she and appellant had lived together for approximately five years and that the two held themselves out to be husband and wife. However, it was discovered that Taylor had never dissolved her prior ceremonial marriage to Dennis Taylor. The prosecutor also elicited testimony that Taylor's driver's license, tax returns, and other documents were all in the name of Allison Taylor, and not Allison Weaver. Taylor opined that she thought that one could be both "paper married" to one person and "common law married" to another, but she understood that one could not have two ceremonial, "paper" marriages concurrently. She also conceded that the above documents listed the name Taylor because she had to use her legal married name. Appellant's counsel also argued that although Taylor was a putative spouse because of her prior undissolved marriage, appellant could still claim the confidential communication privilege because he did not know Taylor was still married until he asked her to marry him after he was incarcerated. The trial court determined that no privilege existed, and Taylor was required to testify.

■■■ To establish a common law marriage, it must be shown that the parties have a present agreement to be married, that they live together as husband and wife, and they represent to others that they are married. Tex.Fam.Code Ann. § 1.91(a)(2) (Vernon 1975); *Phillips v. State*, 701 S.W.2d 875 (Tex.Crim.App.1985), *cert. denied*, 477 U.S. 909, 106 S.Ct. 3285, 91 L.Ed.2d 574 (1987). The existence of such a marriage is a fact question with the burden of proof on the person seeking to establish the existence of the marriage by a preponderance of the evidence. *Hightower v. State*, 629 S.W.2d 920 (Tex.Crim. App.1981).

■■ Once a common law marriage has been established, it is generally given the same legal significance as a ceremonial marriage. This would, by definition, include the privilege not to testify against the other spouse. However, we have never before been presented with the proposition that the spousal privilege should be extended to *putative* spouses.

■■■ A putative spouse is one thought to be the spouse of another in a marriage, in opposition to which there are impediments. *Black's Law Dictionary*, (Fifth Edition). Thus, a putative marriage is one in which at least one of the parties believed themselves to be married, but because of some encumbrance they are not legally married, either by ceremony or common law. Texas law recognizes putative marriages primarily for the purpose of administering equity in property and probate disputes, and in child custody or paternity suits. *See e.g., Jasso v. Robertson*, 771 S.W.2d 231 (Tex.App.—Houston [1st Dist.] 1989, no writ); *Leal v. Moreno*, 733 S.W.2d 322 (Tex.App.—Corpus Christi 1987, no writ); *Padon v. Padon*, 670 S.W.2d 354 (Tex.App.—San Antonio 1984, no writ); *R.A.M., a juvenile, v. State*, 599 S.W.2d 841 (Tex.Civ.App.—San Antonio 1980, no writ); *Davis v. Davis*, 521 S.W.2d 603 (Tex. 1975).

With the exception of equity, putative marriages have never been given the same credence as ceremonial or common law marriages for the very reason that they are putative: there exists some impediment to the marriage. There can be no legal marriage if there is a barrier.

■■ The language of Rule 504(2) is clear and objective—it uses the word "spouse." We must then interpret the rule to mean what it says, and a spouse is one who is legally married to another. The rule does not say "putative spouse," "significant other," or "girlfriend."

■ Furthermore, the Court of Criminal Appeals has indirectly addressed the issue in *Rougeau v. State*, 738 S.W.2d 651 (Tex. Crim.App.1987). In *Rougeau*, the court held that the putative common law wife of the defendant was improperly excluded as a witness for the State in a capital murder trial. *Id.* at 662–663. While the court did not expressly state that Rule 504(2) does not apply to putative spouses, the court did hold that it was error to exclude the appellant's putative wife as a witness, and such error benefited the appellant. *Id.* at 663. Absent proof of a ceremonial or common law marriage recognized as a legal marriage by the law of this state, we hold that the privilege not to testify against one's spouse does not extend to putative marriages.

■ We must now address the issue of whether appellant may claim the privilege with regard to any confidential communications he may have made to Taylor when he believed that a marriage existed between them. Appellant contends that while Taylor may not be able to claim the spousal privilege of 504(2), he is entitled to claim privilege pursuant to 504(1). Appellant argues that since he was not aware that Taylor's previous marriage had not been dissolved, he had a good faith belief that there were no impediments to their common law marriage, and therefore, any communications he made to her were intended to be confidential. *See Dean v. Goldwire*, 480 S.W.2d 494, 496 (Tex.Civ. App.—Waco 1972, writ ref'd n.r.e.); *Rey v. Rey*, 487 S.W.2d 245, 248 (Tex.Civ.App.—El Paso 1972, no writ). If a putative spouse is unaware of the previous undissolved marriage or other impediment, good faith is presumed. *Whaley v. Peat*, 377 S.W.2d 855, 857 (Tex.Civ.App.—Houston [1st Dist.] 1964, writ ref'd n.r.e.).

Taylor testified about the facts already set out above. She related that appellant threatened her, and told her what he had done. She also testified to sequence of events which transpired after she and appellant left Yeary's house.

■ The issue of whether or not appellant and Taylor were married, however, has no bearing on the confidential communication privilege in this case for several reasons. First, the communications appellant made to Taylor in the form of threats were clearly not intended to be kept private, and would not fall within the purview of the rule. Second, Taylor's testimony about what happened, as opposed to what the appellant may have said to Taylor about what he did, is not privileged information. The marital communication privilege applies to utterances and not to acts. *Sterling v. State*, 814 S.W.2d 261 (Tex.App.— Austin 1991, pet. ref'd). Finally, appellant himself signed two confessions and waivers relating the details of the incident to police officers. Thus, any alleged privilege which might have existed with regard to appellant's communications to Taylor was waived when he informed third parties of the contents of those communications. *See Zimmerman v. State*, 750 S.W.2d 194, 199 (Tex.Crim.App.1988); *Bear v. State*, 612 S.W.2d 931, 932 (Tex.Crim.App.1981). Furthermore, since the signed confessions were admitted into evidence and considered by the jury, any error in allowing Taylor to testify was harmless. Tex.R.App.P. 81(b) (Vernon Supp.1992).

The State contends that appellant waived this point of error because he did not request that the common law marriage issue be submitted to the jury. However, the cases cited by the State in support of this argument are misplaced. Those cases only deal with the preservation of error with regard to the jury charge, and do not stand for the proposition that the issue must be submitted to the jury to preserve the common law marriage issue for appeal. While error was preserved, we find that any communications made by appellant to Taylor regarding the capital murder of Yeary lost their confidential character, if any, when appellant made voluntary and knowledgeable statements to police officers. Point of error one is overruled.

In point of error two, appellant claims the trial court erred in failing to give a requested jury charge on the lesser included offense of aggravated assault. The final charge given to the jury consisted of

the offenses of capital murder, murder, and aggravated robbery.

The trial court is required to submit a charge on a lesser included offense if: (1) the lesser included offense is included in the proof necessary to establish the offense charged; and (2) there is some evidence in the record from any source showing that if the defendant is guilty, he is guilty only of the lesser included offense. Tex.Code Crim.Proc.Ann. art. 37.09; *Royster v. State*, 622 S.W.2d 442 (Tex.Crim.App.1981, on reh'g).

Aggravated assault is a lesser included offense of capital murder. However, appellant failed to show that if he was guilty, he was guilty only of aggravated assault. Appellant claimed throughout the investigation and the trial that he did not intend to kill Yeary, only to silence her by causing serious bodily injury. Aggravated assault is an assault resulting in serious bodily injury. Tex.Penal Code Ann. § 22.02 (Vernon 1974). However, by his own signed confession, as well as evidence proffered by other witnesses, he struck and strangled Yeary to enable him to commit the theft of Yeary's money in order to buy cocaine. Hence, while the evidence may tend to prove that he was guilty of some lesser offense, it did not show that offense to be only aggravated assault because of the theft involved. Aggravated robbery, however, consists of intentionally causing bodily injury while committing theft, which results in serious bodily injury. Tex.Penal Code Ann. § 29.03 (Vernon 1974). The trial court did in fact charge the jury on aggravated robbery. We, therefore, find that the trial court did not err in refusing to submit appellant's requested charge. Point of error two is overruled.

In his final point of error, appellant asserts that the trial court erred in making an affirmative finding that a deadly weapon was used in the commission of the offense. Normally, unless the indictment in some manner alleges the use of a deadly weapon, or the weapon is deadly per se, or the jury makes an express finding of fact of the use of a deadly weapon in

response to a special issue, the trial judge is precluded from entering an affirmative finding in the judgment. *Polk v. State*, 693 S.W.2d 391 (Tex.Crim.App.1985). *But see, Ex parte Beck*, 769 S.W.2d 525 (Tex. Crim.App.1989); *Ex parte Franklin*, 757 S.W.2d 778 (Tex.Crim.App.1988). A trial judge may make such a finding after hearing on punishment if the defendant elects to have the judge assess punishment. *Fann v. State*, 702 S.W.2d 602, 604 (Tex. Crim.App.1985, *on reh'g*).

The indictment in this case did not allege that a deadly weapon was used, nor was the issue of a deadly weapon presented to the jury. Nor was there a separate punishment hearing by the trial judge at which evidence was taken on the issue of whether a deadly weapon was used or exhibited during the commission of the offense. The court did not include the deadly weapon issue in the jury charge. The trial court, upon receipt of the jury verdict, and in response to the prosecution's request for a deadly weapon finding, stated that the issue had been submitted to the jury. Over defense counsel's objection, he then made an affirmative finding of a deadly weapon which was later included in the judgment. We agree with appellant. Under the facts of this case, such a finding by the judge was error.

Contrary to the trial judge's statement, the issue was not submitted to the jury and the nature of the instrumentalities used are not clearly deadly weapons per se. We are not unmindful of *Fann v. State, supra.* In *Fann*, the court of criminal appeals ruled the trial judge as the fact finder in the hearing on the punishment phase of the trial has the authority to make an affirmative finding on use of a deadly weapon. However, no hearing was held and no evidence was presented on the deadly weapon issue in the case before us.

We interpret *Fann* as requiring a punishment hearing where evidence is heard before a deadly weapon finding can be made by the trial judge as fact finder. Particularly, such a hearing is required where the question of the use of a deadly

weapon is so unclear as in the case here. If the evidence presented in the guilt/innocence phase as to a deadly weapon is clear as to the weapon used, such as a *per se* type of weapon, the requirement of a hearing is not critical. Here, it is. We, therefore, reform the judgment to delete the finding of a deadly weapon.

 In any event, the error here was harmless. An affirmative finding of the use of a deadly weapon in the commission of a crime affects the defendant's parole eligibility by making him ineligible for parole until his actual time served equals one-fourth the maximum sentence or fifteen years, whichever is less. TEX.CODE CRIM. PROC.ANN. art. 42.18 Sec. 8(b) (Vernon Supp.1992). Nevertheless, appellant's parole eligibility remains limited because he was convicted of capital murder, a capital felony governed by TEX.CODE CRIM.PROC. ANN. art. 42.18 sec. 8(b)(2), which provides that appellant, serving a life sentence, must serve actual calendar time, without credit for good conduct, of thirty-five years. Consequently, since the deletion of the affirmative finding of a deadly weapon will not affect parole eligibility, the error is harmless.

 However, if a judgment improperly reflects the findings of the jury, the proper remedy is the reformation of the judgment. *Asberry v. State*, 813 S.W.2d 526, 529 (Tex. App.—Dallas 1991, pet. ref'd). Thus, pursuant to rule 80(b) of the rules of appellate procedure, we reform the judgment to delete the affirmative deadly weapon finding. Point of error three is sustained.

Accordingly, the judgment of the trial court is

AFFIRMED AS REFORMED.