

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

## AP-74,853

### WILLIAM DARIN IRVAN, Appellant

#### v.

### THE STATE OF TEXAS

## ON DIRECT APPEAL
## FROM CAUSE NO. 864928 IN THE 180TH DISTRICT COURT
## HARRIS COUNTY

**Keasler, J., delivered the opinion of the Court, in which Keller, P.J., and Meyers, Womack, Johnson, Hervey, and, Cochran, JJ., joined. Price and Holcomb, JJ., concurred without opinion.**

### O P I N I O N

Irvan was convicted of capital murder[1] in December 2003. Based on the jury's

answers to the special issues set forth in Texas Code of Criminal Procedure Article 37.0711,

---

[1] TEX. PENAL CODE § 19.03(a).

Sections 3(b) and 3(e),[2] the trial court sentenced Irvan to death.[3] Direct appeal to this Court is automatic.[4] Irvan raises eighteen points of error. We find each of them to be without merit. Therefore, we affirm his conviction and sentence.

## STATEMENT OF FACTS

Irvan was indicted for murdering twenty-three-year-old Michelle Shadbolt while in the course of committing and attempting to commit aggravated sexual assault on or about February 14, 1987. The evidence at trial showed that, at the time of the offense, Shadbolt and her two-year-old daughter were living in a house across the street from Irvan's parents' house. Shadbolt and Irvan had lived across the street from each other for many years, and Irvan had been friends with Shadbolt's younger brother since early childhood.

Shadbolt and her husband, Jack, had separated about six weeks before her murder, and Jack had moved out of the house and into his mother's house nearby. Shadbolt's father and stepmother also lived close by, and on the evening of February 13, 1987, Shadbolt took her daughter to their house for the night so Shadbolt could go out and play bingo with some friends. She dropped off her daughter at about 5:15 p.m. and said that she would return to pick her up at 7:30 the next morning. When Shadbolt failed to arrive at 7:30 a.m. on February 14th, her stepmother called her house, but no one answered. She then drove to

---

[2] Unless otherwise indicated, all references to Articles refer to the Texas Code of Criminal Procedure.

[3] Art. 37.0711, § 3(g).

[4] Art. 37.0711, § 3(j).

Shadbolt's house at about 7:45 a.m. When she opened the unlocked front door, she saw Shadbolt's bloody body lying on the living room floor and ran to a neighbor's house to call the police.

Anthony Rossi of the Harris County Sheriff's Department was the lead detective in the case. Rossi testified that there were no signs of forced entry and that the television was turned up very loud. There was a large amount of blood in the foyer, leading him to conclude that "some type of scuffle" occurred there. Shadbolt was lying on her side on the living room floor, wearing only a blood-stained T-shirt that had been pulled up around her neck. She had multiple stab wounds and a large neck laceration. Rossi testified that there was a vacuum cleaner on the floor next to Shadbolt, and its cord, which was "probably . . . twisted around during a struggle," was "somewhat wrapped around her." Also lying on the floor nearby were a pair of panties, some crumpled newspaper, a trophy, and a large-bladed knife underneath a pair of shorts. Blood on the trophy led Rossi to believe it was "[p]ossibly used as a bludgeon instrument." Shadbolt's purse, wallet, and money were in the kitchen, but a large-bladed knife was missing from the butcher block.

Rossi testified that he thought that "[o]ne heck of a struggle" took place in the living room and Shadbolt "fought very hard." He also testified that he observed "bloody fingermarks" on Shadbolt's "rear end," which he believed were indicative of someone "trying to hold her up" in order to "rape her." He further observed blood in and around the toilet bowl in Shadbolt's bathroom, which he thought was consistent with someone washing

off blood in the toilet.

Pete F. Schroedter, a fingerprint expert with the Harris County Sheriff's Department, processed the knife and trophy for fingerprints. He found "smudges . . . lacking any detail for identification purposes" on the knife. He found what appeared to be a portion of a palm print on the trophy, but it lacked sufficient detail for him to make an identification. Deputy Randy Schield and the FBI were also unable to identify any fingerprints.

Medical examiner Dwayne Wolf testified that Shadbolt's death was caused by "multiple sharp force injuries." She had seventeen stab wounds on her body, some of which perforated her heart, diaphragm, and liver. She also had a large, horizontal, incised wound to the front of her neck, and some "superficial cutting wounds" in the neck area, including a superficial incised wound on the back of her neck. She suffered multiple blunt force injuries to the top of her head that were consistent with being struck with the base of the trophy. She had several bruises on her face, and abrasions on her face, knees, and shoulder that were consistent with "carpet burn." Sperm was detected on swabs taken from her vagina and rectum, although there was no visible trauma to these areas.

Shadbolt's brother, Michael Masters, testified that Irvan was outside Shadbolt's house when he arrived there on the morning of February 14th, shortly after Shadbolt's body was discovered. Irvan attempted to comfort Masters both at the scene and later at Shadbolt's funeral, where Irvan served as a pallbearer.

Police questioned Shadbolt's friends who were playing bingo with her the night of

February 13th and determined that Shadbolt left to go home at around 2:50 a.m. About a week after Shadbolt's murder, Rossi met with Shadbolt's husband Jack, who denied involvement and provided saliva, hair, and blood samples. Rossi considered Jack to be the prime suspect because he and Shadbolt were separated at the time of her death, but Rossi did not have evidence to charge him with capital murder.

Rossi transferred to another division a few years later, and Detective Marcel Dionn began working on the case. Dionn asked Shadbolt's mother, Jacqueline Barrett, if she could provide the names of any other persons who might have been involved in Shadbolt's murder. Barrett named Irvan and another individual, Timothy Darden. Dionn interviewed Irvan at the police station on May 17, 1989. Irvan made a statement wherein he said that he had known Shadbolt for about fifteen years and they "were just friends and it was never any type of other relationship." He stated that, a few days before Shadbolt's murder, he had returned to his parents' house after working an offshore job. He had a ten-minute conversation with Shadbolt in front of her house a day or two before the murder, wherein she talked about "her kid" and "never said anything about her and Jack." After they talked, he went back to his parents' house and "didn't see [Shadbolt] alive again." On the night of the murder, he was "at home with [his] mother and didn't go anywhere." His mother woke him up the next morning and told him "something was wrong over at [Shadbolt's]." When he went outside, Masters walked up to him, told him Shadbolt was dead, and started crying.

Shadbolt's case remained unsolved for years, until Detective Roger Wedgeworth with

the "cold case squad" of the Harris County Sheriff's Department began investigating it again in 1998. In November 1998, Wedgeworth sent evidence to the Orchid Cellmark (formerly GeneScreen) laboratory for DNA testing and comparison to Jack. Orchid Cellmark determined that Jack was excluded as a contributor of the DNA on Shadbolt's vaginal and rectal swabs. Wedgeworth's partner, Harry Fikaris, then asked Barrett if she could think of anyone else who might have murdered Shadbolt. Barrett again named Irvan and Darden. She also told the detectives about an incident that occurred when Irvan once spent the night with Masters at their house. Shadbolt was sixteen and Irvan was thirteen at the time. After everyone had gone to bed, Barrett heard Shadbolt scream, "Stop it. Leave me alone." Barrett went to Shadbolt's room, where she saw Shadbolt sitting in bed with the covers "up against her as if she was protecting herself." Irvan was sitting on the floor acting "real coy." Shadbolt acted "real scared" and told Barrett that Irvan touched her. Barrett brought Shadbolt into her room and told Irvan to either stay in Masters' room or to go home. After that incident, Irvan never spent the night at their house again.

At some point after DNA testing excluded Jack, Masters called Irvan and asked him if he knew or heard of anyone who might have killed Shadbolt. Masters testified that Irvan "broke down and cried and said he didn't have anything to do with it," even though Masters did not accuse Irvan of anything.

Irvan and Darden both consented to give saliva samples to Wedgeworth and Fikaris in early 2000. The samples were sent to Orchid Cellmark for DNA testing. William J.

Watson of Orchid Cellmark testified that Irvan's DNA profile was consistent with the DNA profile on Shadbolt's rectal swab. A "probable pubic hair" taken from Shadbolt's fingernail scrapings was compared to Shadbolt, Irvan, and Darden, but did not match any of them. Darden was excluded as a contributor to all pieces of evidence where a DNA profile could be obtained.

Katherine Elizabeth Long with Orchid Cellmark performed additional DNA testing a few weeks prior to trial. Long concluded that Irvan's DNA profile was consistent with the DNA profile on Shadbolt's rectal and vaginal swab sticks.

Irvan's former girlfriend Tamara Llamas testified that she and Irvan spent one night alone on the beach in Galveston in February or March 1987. As they were drinking alcohol and talking, Irvan told Llamas he had raped and killed Shadbolt. He explained that he was sitting and drinking in his driveway when he saw Shadbolt come home, then he went over to her house to try to have sex with her. When she refused, he "got carried away" and stabbed her. He said Shadbolt "fought real hard" and scratched him, and there was blood everywhere. He said he took some jewelry from Shadbolt's home and returned to his house through his bedroom window.

Llamas testified that she did not believe Irvan and "just thought he was bragging," and she told only her friend Rhonda Reiner what he said a few months later. When Irvan was charged with capital murder, Reiner persuaded Llamas to tell police about Irvan's admission. Llamas acknowledged that she was a convicted drug dealer and murderer serving four life

sentences in a federal prison in Fort Worth, but testified that she received no promises in exchange for her trial testimony. She testified she was initially reluctant to come forward, but she changed her mind because she did not want Shadbolt's daughter "to grow up thinking that her father had done it."

Irvan's ex-wife Shanna Stryjek testified that Irvan "would go into a rage" when she declined to have sex with him and would hit and break things and call her degrading names like "bitch," "whore," "slut," and "cunt." Stryjek testified that she refused when Irvan attempted to have anal sex with her a few times, and she once had to "kind of force him to stop." She testified that they saw Shadbolt's daughter when she was about four or five years old, and Irvan refused to look at the child. Stryjek once asked Irvan about Shadbolt, and Irvan stated "she was a bitch, that she was snotty and she thought she was better than everybody else." Stryjek asked Irvan if he ever dated her and he said no and that he "hated her." He told Stryjek that the night Shadbolt died he was out with his friend "George" and returned home between 1:00 and 2:00 a.m. He told Stryjek he did not know anything happened to Shadbolt until his mother came into his room in the morning and said police were putting yellow tape around her house.

Defense witness Daniel Rinehart, who worked on the cold case squad with Wedgeworth and Fikaris, testified about his additional fingerprint processing of evidence using the "amido black dye method." Rinehart testified that he found a "small area with ridge detail" on the trophy. He testified that the print "was not suitable to include and

identify an individual," but it "was suitable enough to eliminate suspects that the prints were compared to." Rinehart was able to eliminate Jack and Irvan. He was not able to eliminate Darden, but he was not able to positively identify him as the person who left the print.

Defense witnesses Connie Summers, Darlene "Dede" Hughes, and Marylou Brady all testified that Llamas had a bad reputation for truthfulness and was not worthy of belief under oath. Hughes also testified that she saw Irvan and Shadbolt together in a convenience store at some point in January or February 1987, before Shadbolt's death. The defense then re-called Wedgeworth, who testified that a deputy used a chemical process to look for blood under the surface of the paint around Irvan's bedroom window. A small "droplet sized" spot was detected, so they cut out the portion where the spot was located and sent it to Orchid Cellmark for DNA analysis. Orchid Cellmark reported that Irvan and Shadbolt were excluded as contributors.

## SUFFICIENCY OF THE EVIDENCE

In points of error one, two, and three, Irvan argues that the evidence is factually insufficient to support his conviction for capital murder. In a factual sufficiency review, we view all of the evidence in a neutral light, and we will set the verdict aside only if the evidence is so weak that the verdict is clearly wrong and manifestly unjust, or the contrary evidence is so strong that the standard of proof beyond a reasonable doubt could not have been met.[5] A clearly wrong and unjust verdict occurs where the jury's finding is "manifestly

---

[5] *Zuniga v. State,* 144 S.W.3d 477, 481 (Tex. Crim. App. 2004).

unjust," "shocks the conscience," or "clearly demonstrates bias."[6]

Irvan acknowledges that "semen recovered from [Shadbolt] matched [Irvan's] DNA profile." He argues that this "supports a conclusion that [Irvan] and [Shadbolt] had engaged in sexual intercourse," but does not "support an inference that [Irvan] had sexually assaulted [Shadbolt] nor that he had caused her death." Irvan asserts that medical examiner Dwayne Wolf's testimony that there was no evidence of trauma to Shadbolt's vagina or rectum supports a finding of consensual sex. However, trauma to the genitalia is not a required prerequisite for proving sexual assault. Wolf testified that the absence of such trauma "doesn't mean anything," and "sometimes you see injuries; sometimes you don't."

Irvan argues that "Wolf agreed that [Shadbolt] could have engaged in sexual intercourse the day before her death." While Wolf agreed with defense counsel that "consensual sex may have taken place" and that the death "may have taken place later," he also testified that "numerous sperm were present" in both the vagina and rectum, and because "[s]perm degrades over a period of time, particularly in the rectal canal . . . it ha[d] to be relatively fresh." Wolf explained that "[s]perm are more stable in the vaginal canal than they are in the rectum" because "there is more bacteria in the rectal vault." Wolf agreed it was "probably true" when defense counsel suggested that sperm could remain in the vagina up to seventy-two hours, but he testified it could probably not remain in the rectum that long and still be classified as "numerous spermatozoa present."

---

[6] *Santellan v. State*, 939 S.W.2d 155, 164 (Tex. Crim. App. 1997).

Irvan also argues that Wolf and Detective Rossi gave conflicting testimony regarding blood evidence. Rossi testified there were "bloody fingermarks" on Shadbolt's "rear end," which he believed were indicative of someone "trying to hold her up" in order to "rape her." Wolf testified it was "a pattern of a hip laying in a pool of blood, so that you have a rim of blood surrounding an area that was pressed against the floor in this case." But Irvan fails to acknowledge that Rossi and Wolf were referring to two different photographs of Shadbolt when they made these statements. Wolf referred to State's Exhibit 50, a photograph of Shadbolt's body after it was received by the medical examiner. The photograph, which is neither close-up nor particularly detailed, is a side view of Shadbolt lying on her back on the autopsy table. In contrast, Rossi referred to State's Exhibit 34, a photograph of Shadbolt's body as it was found at the crime scene, which is a back view of her body from her shoulders to her "rear end." The jury was able to view these photographs and to take the testimony of Wolf and Rossi into account when viewing them.

Irvan points out that he was excluded as the person who left the hair under Shadbolt's fingernail and the fingerprint on the trophy. However, both Wedgeworth and Watson testified that the hair could have come from a source other than Shadbolt's attacker. Schroedter testified that an excessive amount of blood could be an impediment to leaving a print, and that the available methods for processing bloody fingerprints were somewhat limited in 1987. Rinehart was able to eliminate Irvan as the person who left the "small area with ridge detail" on the trophy, but he also testified there were other prints that were

unidentifiable.

Finally, Irvan alleges that "the forensic investigation in this case was incomplete and unreliable." He claims that the police failed to perform DNA testing or fingerprint processing on several pieces of evidence. Irvan's speculation regarding further investigation does not establish the evidence actually introduced at trial was insufficient to prove his guilt. The evidence supporting the verdict was not so weak as to be clearly wrong and manifestly unjust, nor was the contrary evidence so strong that the standard of proof beyond a reasonable doubt could not have been met. Points of error one, two, and three are overruled.

## CONFIDENTIAL COMMUNICATION PRIVILEGE

In points of error four, five, and six, Irvan complains that the trial judge improperly denied his "invocation of the spousal communication privilege" in violation of Rule 504 of the Texas Rules of Evidence. The spousal privilege rule has two parts, the first part deals with communications to the spouse which were intended to be kept private, and the second part is a privilege for the spouse not to be called as a witness at all.[7] Irvan alleges a violation of Rule 504(a), which provides in pertinent part:

(a) Confidential communication privilege.

(1) Definition. A communication is confidential if it is made privately by any person to the person's spouse and it is not intended for disclosure to any other person.

(2) Rule of privilege. A person, whether or not a party, or the guardian or representative of an incompetent or deceased person, has a privilege during

---

[7] *Weaver v. State,* 855 S.W.2d 116, 119-20 (Tex. App.–Houston [14th Dist.] 1993).

their marriage and afterwards to refuse to disclose and to prevent another from disclosing a confidential communication made to the person's spouse while they were married.

(3) Who may claim the privilege. The confidential communication privilege may be claimed by the person or the person's guardian or representative, or by the spouse on the person's behalf. The authority of the spouse to do so is presumed.

Irvan also alleges that the trial judge violated his rights under the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution, but he did not object on a constitutional basis at trial.[8]

Before trial, Irvan filed a motion entitled, "Defendant's Notice of Intention to Invoke Confidential Communication Privilege Between Husband and Wife Pursuant to Texas Rule of Evidence 504(a)." There was a hearing on the motion outside the presence of the jury at trial. Irvan testified at the hearing that he was married to Shanna Stryjek from December 4, 1987 to September 9, 1995, that he did not intend to disclose to anyone the private conversations they had during their marriage, and that he wanted to exercise his privilege to prevent Stryjek from disclosing the confidential communications he made to her during their marriage. The trial judge overruled Irvan's motion and granted a running objection to Stryjek's testimony.

Irvan specifically complains that Stryjek was improperly permitted to testify that, while they were married, Irvan: (1) called her degrading names like "bitch," "slut," "whore," and "cunt"; (2) told her Shadbolt "was a bitch, that she was snotty and she thought she was

---

[8] TEX. R. APP. P. 33.1.

better than everybody else" and he "hated her"; and, (3) told her he "was really out with [his friend] George" and "got home about 1:00, 1:30, 2:00" on the night Shadbolt was murdered, although "he told the police that he was at home all night with his mother." Stryjek testified that Irvan called her degrading names when she refused to have sex with him and that they were alone when he divulged his feelings about Shadbolt and his whereabouts on the night of her murder. Irvan testified he did not intend to disclose his private communications with Stryjek while they were married.

Irvan's statements to Stryjek concerning his feelings about Shadbolt and his whereabouts on the night of Shadbolt's murder were privileged under Rule 504(a), and the trial judge erred in permitting Stryjek to testify about these confidential communications. Moreover, we assume without deciding that the trial judge erred in allowing Stryjek to testify about the degrading names Irvan called her when she refused to have sex with him because the statements were privileged under Rule 504(a). We now consider whether Irvan was harmed by the admission of Stryjek's testimony. Texas Rule of Appellate Procedure 44.2(b) provides that any non-constitutional error that does not affect substantial rights must be disregarded. A substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury's verdict.[9] In assessing the likelihood that the jury's decision was adversely affected by the error, we consider everything in the record, including any testimony or physical evidence admitted for the jury's consideration, the nature

---

[9] *King v. State,* 953 S.W.2d 266, 271 (Tex. Crim. App. 1997).

of the evidence supporting the verdict, and the character of the alleged error and how it might be considered in connection with other evidence in the case.[10] We may also consider the jury instructions, the State's theory, any defensive theories, closing arguments, voir dire, and whether the State emphasized the error.[11]

The most compelling evidence against Irvan was his admission to Llamas and the physical evidence showing his DNA profile matched sperm recovered from Shadbolt's body. Other significant evidence consisted of Barrett's testimony regarding Irvan's unwelcome intrusion into Shadbolt's room several years before the murder and Masters's testimony regarding Irvan's reaction when Masters asked him about the murder years later.

The State argued at closing that Irvan went over to Shadbolt's house because he wanted to have sex with her and went into a "sadistic sex rage" when she "[t]urned him down." The State mentioned Irvan's comment that Shadbolt was a "snotty bitch" and his habit of "calling [Stryjek] every name in the book" when Stryjek refused to have sex with him. However, this was not the only evidence in support of the State's "sadistic sex rage" theory. Llamas testified that Irvan told her he went over to Shadbolt's house to try to have sex with her, and he "got carried away" and stabbed her when she refused. Further, admissible testimony from Stryjek revealed that Irvan would "go into a rage" and "start

---

[10] *Motilla v. State,* 78 S.W.3d 352, 355 (Tex. Crim. App. 2002).

[11] *Id.*

hitting things" and "breaking things" when she refused to have sex with him.[12]

Irvan's statement that he "was really out with [his friend] George" and "got home about 1:00, 1:30, 2:00" did not have much significance when viewed in light of all of the evidence. Irvan told police he was "at home with [his] mother and didn't go anywhere," and he told Llamas that he was sitting outside and drinking in his driveway when Shadbolt came home. Shadbolt's friends told police that she left to go home at around 2:50 a.m., and Detective Rossi theorized she was murdered sometime after 3:00 a.m. Even if Irvan had been out with "George" until 2:00 a.m., he still would have been "at home" in time to commit the crime. Although Irvan's statement to Stryjek showed that he lied to police, the discrepancies between his statement to police and his admission to Llamas also served to prove the same point.

The admission of Stryjek's testimony did not affect Irvan's substantial rights.[13] The error did not have a substantial and injurious effect or influence in determining the jury's verdict.[14] Points of error four, five, and six are overruled.

## CONFRONTATION

In points of error seven through eleven, Irvan argues that "the trial court committed

---

[12] *See Weaver,* 855 S.W.2d at 121 (holding that the marital communication privilege of Rule 504(a) applies to utterances and not to acts); *see also Carter v. State,* 550 S.W.2d 282, 286 (Tex. Crim. App. 1977), *overruled on other grounds by Shipman v. State,* 604 S.W.2d 182, 185 (Tex. Crim. App. 1980).

[13] TEX. R. APP. P. 44.2(b).

[14] *King,* 953 S.W.2d at 271.

constitutional error by not allowing [his] counsel to confront and cross-examine Tamara Llamas" regarding: (1) "her full criminal history"; (2) "her customary practices and habits of employing juveniles in interstate trafficking and distribution of marijuana"; (3) "her customary practices and habits of employing minors to transport weapons across state lines in furtherance of her criminal activities"; (4) "her customary practices and habits of making false criminal accusations against others"; and, (5) "her customary practices and habits of hiring others to kill witnesses against her in pending criminal prosecutions." Irvan specifically argues that the trial judge violated his rights under the Sixth and Fourteenth Amendments to the United States Constitution and Article I, Section 10 of the Texas Constitution.

The State called Llamas as a witness and questioned her regarding her criminal history. Llamas acknowledged she was presently serving four concurrent life sentences in federal prison for conspiracy to distribute and possess with intent to distribute marijuana, interstate travel with intent to commit murder for hire, use of a firearm during and relating to a drug-crime death, and tampering with a witness by killing. She testified that she pleaded guilty to all four federal offenses. She testified that she had a previous Maryland conviction for misdemeanor theft and two previous Texas convictions for unauthorized use of a motor vehicle, one of which was a misdemeanor and one of which was a felony. She further testified that she had a probation revocation in Texas.

When defense counsel questioned her, Llamas again acknowledged she pleaded guilty

to four federal offenses. Defense counsel attempted to ask her if she was actually guilty of the federal offenses and if the federal government dismissed any other cases as a result of her federal plea bargain. The State objected to this as improper impeachment, and the trial judge sustained the objection. Defense counsel argued outside the presence of the jury that he should be permitted under Texas Rules of Evidence 405(b) and 406 to ask Llamas about specific instances of conduct and her "character trait" of attempting to manipulate the criminal justice system. Under Texas Rule of Evidence 608(b), the trial judge ruled that defense counsel could not ask Llamas about specific instances of conduct. Defense counsel later made a bill of exceptions listing the "information that should have been allowed in front of the jury," including the specific details of Llamas' federal offenses, the other federal cases that were dismissed as a result of her federal plea bargain, the fact that she filed false charges against two other people, and her attempt to hire a hit man to kill her own sister.

Irvan's argument at trial does not comport with the issue he now raises on appeal. He failed to argue at trial that the exclusion of the evidence at issue violated his right to confront and cross-examine witnesses under the federal or state constitutions. Because his trial objection is not the issue raised on appeal, Irvan preserved nothing for our review.[15] Points of error seven through eleven are overruled.

### RIGHT TO PRESENT A MEANINGFUL DEFENSE

In point of error twelve, Irvan argues that the trial judge violated his due process right

---

[15] TEX. R. APP. P. 33.1.

to present a meaningful defense "by not allowing [Irvan's] counsel to present evidence that, shortly before her death, [Shadbolt] had instructed Dede Hughes, a witness, not to tell anyone that [Shadbolt] and [Irvan] were observed 'together.'" Irvan argues that this evidence "would have rebutted the State's claims that there was no evidence of a relationship between [Irvan] and [Shadbolt]," "would have explained the absence of any statements by [Irvan] regarding his relationship with [Shadbolt]," and "could [have rebutted] the State's allegations that any sexual activity was not consensual."

Hughes testified that, sometime after January 1, 1987, and before February 14, 1987, she saw Irvan and Shadbolt together inside a convenience store and she had a brief conversation with them. Defense counsel then asked Hughes if Irvan and Shadbolt "[gave her] some instructions" or "[told her] something" during the conversation. The State made a hearsay objection and defense counsel responded he was not offering the statement to prove the truth of the matter asserted.[16] The trial judge sustained the State's hearsay objection. Defense counsel later made a bill of exceptions, stating Hughes "would have testified that both Michelle Shadbolt and William Irvan told her not to tell anyone that she had seen the two of them together."

Irvan does not argue on appeal that the trial judge's hearsay ruling was erroneous. He only argues that the trial judge's exclusion of the evidence violated his constitutional right to present a meaningful defense. Irvan failed to make this argument at trial and thus failed

---

[16] TEX. R. EVID. 801.

to preserve it for appeal.[17] Point of error twelve is overruled.

In points of error thirteen and fourteen, Irvan argues that the trial judge violated his due process right to present a meaningful defense by not allowing defense counsel to present "evidence that Detective Rossi had learned in his investigation that [Shadbolt] had told Jack Shadbolt, her estranged husband, two days before her death that they would never get back together" and "evidence of the basis upon which Detective Rossi continued his investigation of Jack Shadbolt as a prime suspect in this case." Irvan argues that "the trial court erred in excluding this evidence as 'hearsay' as it was not presented for the truth of its contents but for the fact that it explained the basis of Rossi's belief that Jack Shadbolt was a murderer . . . and [Irvan's] state of mind regarding his need to protect and keep his relationship with [Shadbolt], a married woman, secret." He also contends that the evidence would have refuted the State's argument that there was no relationship between Irvan and Shadbolt.

Rossi testified at trial that it was possible that Shadbolt knew her attacker because there were no signs of forced entry. Rossi further testified that Jack Shadbolt was the first potential suspect because he was Shadbolt's spouse and they had been recently separated. Defense counsel continued to question Rossi as follows:

> Q. Did you learn anything else while there at the scene about their relationship that helped strengthen that possibility?
>
> A. He was an alcoholic.
>
> Q. Okay. You recall that you learned it there while you were at the initial

---

[17] TEX. R. APP. P. 33.1.

scene?

A.     Yes, sir.

Q.     Okay.  Anything else about their relationship?

A.     I don't recall anything else.

Q.     Did you ever learn that they weren't ever going to get back together again?

[PROSECUTOR]:  Judge, I am going to object to that.  That's going to be hearsay.

THE COURT:  Sustained as to the form of the question.

Q.     Isn't it true, Detective Rossi, that you learned through your investigation that Michelle Shadbolt had told her husband two days--

[PROSECUTOR]:  Objection.  That's hearsay.

THE COURT:  Let him finish the question.

Q.     -- two days before this killing that she had told her husband they were not going to get back together?

THE COURT:  Your objection is sustained.

[DEFENSE COUNSEL]:  Judge, may I respond?

THE COURT:  Yes, sir.

[DEFENSE COUNSEL]:  First of all, this is cross-examination.  And he has been allowed to talk about his theory based upon what he has learned. And I think it is a valid place to cross-examination [sic], valid question.

THE COURT:  The objection is sustained.

Q.     Did you learn anything else about the relationship between the two, at the time, that strengthened your resolve that he was a possible suspect?

[PROSECUTOR]: Judge, I object to anything that calls for a hearsay answer.

THE COURT: Sustained as to the form of the question.

Q. Did you learn anything else about the relationship, yes or no, if you recall?

A. No, sir, I don't recall.

Although defense counsel was unable to ask the question in his desired format, he essentially received an answer when Rossi ultimately testified that he did not recall learning anything else about the relationship between Michelle and Jack Shadbolt. Moreover, this complaint is not preserved for our review.[18] Defense counsel failed to argue at trial that the exclusion of the evidence violated Irvan's constitutional right to present a meaningful defense. He also failed to make an offer of proof or bill of exceptions showing the testimony he expected to elicit from Rossi.[19] Points of error thirteen and fourteen are overruled.

## LESSER-INCLUDED OFFENSE

In point of error fifteen, Irvan complains that the jury should have been instructed on the lesser-included offense of murder. Defense counsel made the following request at trial:

Judge, it is our position that through a question of the medical examiner on either redirect or re-redirect by [the prosecutor], she had asked the medical examiner whether or not it was consistent or it could be consistent with the fact that there was no trauma to Miss Shadbolt's vulva, vagina or anal/rectal area

---

[18] TEX. R. APP. P. 33.1.

[19] *See Guidry v. State,* 9 S.W.3d 133, 153 (Tex. Crim. App. 1999) (holding error in the exclusion of evidence may not be urged unless the proponent perfected an offer of proof or a bill of exceptions).

that could be consistent with somebody having been killed and then having the sexual assault take place. And I believe his response was something to the effect, well, that might explain why there were no injuries, but who knows, or something to that effect.

We believe that that evidence brought out and put in front of the jury by the State would raise the lesser included offense of murder in that you would have a murder, but you can't have the sexual assault that would take place after the fact. You might have abuse of corpses, something like that, but certainly not a capital murder.

\*     \*     \*

THE COURT: I will deny that request.

We use a two-part test to determine whether a defendant is entitled to an instruction on a lesser-included offense.[20] The first step in our analysis is to determine if the lesser offense is included within the proof necessary to establish the offense charged.[21] Here, the first part of the test has been satisfied because we have held that murder is a lesser-included offense of capital murder.[22] The second step requires an evaluation of the evidence to determine whether there is some evidence that would permit a jury rationally to find that the defendant is guilty only of the lesser offense.[23] In other words, there must be some evidence from which a jury could rationally acquit the defendant of the greater offense while

---

[20] *Rousseau v. State,* 855 S.W.2d 666, 673 (Tex. Crim. App. 1993).

[21] *Id.*

[22] *Jones v. State,* 833 S.W.2d 118, 127 (Tex. Crim. App. 1992).

[23] *Id.* at 672; *Rousseau,* 855 S.W.2d at 672; *Moore v. State,* 969 S.W.2d 4, 8 (Tex. Crim. App. 1998).

convicting him of the lesser-included offense.[24] The evidence must establish the lesser-included offense as a valid rational alternative to the charged offense.[25]

The medical examiner, Dwayne Wolf, testified that "sometimes you see injuries, sometimes you don't see injuries, if a woman is sexually assaulted" and "[i]f there are no injuries it doesn't mean she wasn't sexually assaulted." The prosecutor asked Wolf on re-direct examination if there would be fewer injuries to a woman's genitalia "if the rape happened when she was dead." Wolf replied: "There would probably be less injuries. I am not sure that - - I am not sure that that is known." When questioned by defense counsel on re-cross examination, Wolf testified: "if [Shadbolt] was sexually assaulted, we don't know when that occurred, while she was becoming unconscious because she was bleeding from her neck wound, or at the height of the struggle. There is no way to know." Defense counsel asked, "In other words, you can't tell whether the sexual assault, if there was one, occurred at the time of the killing, occurred earlier or occurred after death, for that matter?" Wolf replied in the affirmative.

The jury could not rationally acquit Irvan of capital murder and convict him only of murder merely because the medical examiner could not pinpoint the exact timing of the sexual assault. There was other evidence showing that Irvan murdered Shadbolt in the course of committing aggravated sexual assault. Rossi testified he observed "bloody fingermarks"

---

[24] *Moore,* 969 S.W.2d at 8.

[25] *Wesbrook v. State,* 29 S.W.3d 103, 113-14 (Tex. Crim. App. 2000).

on Shadbolt's "rear end," which he believed were indicative of someone "trying to hold her up" in order to "rape her." Llamas testified Irvan told her that he "raped" and "killed" Shadbolt. Llamas also explained that Irvan said he went to Shadbolt's house to try to have sex with her, he "got carried away" when she refused, she "fought real hard," and he stabbed her. Irvan has failed to satisfy the second requirement of the test; therefore, the trial judge did not err in refusing his request for an instruction on the lesser-included offense of murder.

Irvan also argues that he was entitled to an instruction on the lesser-included offense of murder because the evidence showed he had consensual sex with Shadbolt before he killed her. This is not the argument he presented to the trial judge when he requested the lesser-included offense instruction.[26] He argued at trial that he was entitled to the instruction because the medical examiner's testimony showed he could have had sex with Shadbolt after he killed her. Irvan argues on appeal that the trial judge's refusal to instruct the jury on the lesser-included offense of murder denied his due process rights under the Fifth and Fourteenth Amendments and Article I, Section 19, but he also failed to make this argument at trial.[27] Point of error fifteen is overruled.

## RESIDUAL DOUBT INSTRUCTION

In point of error sixteen, Irvan argues that the trial judge violated the Eighth Amendment to the United States Constitution when the judge denied his "request for an

---

[26] TEX. R. APP. P. 33.1.

[27] *Id.*

instruction allowing the jurors to consider any residual doubt as a mitigating circumstance when answering the mitigation special issue." He contends that the trial judge denied "his right to place all mitigating evidence, including the 'circumstances of the offense[,]' within the jury's effective reach in deciding whether a life sentence is more appropriate than the death penalty."

Irvan was not entitled to a residual doubt instruction. There is no constitutional right to have the jury consider their "residual doubts" over a defendant's guilt as a mitigating factor at the punishment phase of a capital murder trial.[28] Moreover, defense counsel was able to present a "residual doubt" argument to the jury in his closing argument at punishment:

> This is your last chance. If there is some question in your mind, this is your last chance to do something about it. Because that day in the future when you hear on television, well, they are killing [William] Irvan next Thursday, if the thought even runs through your mind, what if that bloody print on the trophy that bludgeoned Michelle Shadbolt, what if that was the killer's print?

> And even more crucial, what if those probable pubic hairs under her fingernails belonged to her killer? What if? Because they are going to kill [William] Irvan tomorrow or Thursday or whatever day.

> If you are even thinking what if about that right now, if that thought has crossed your mind this is your last chance to do something about that, because that is part of the circumstances of the offense that you are to consider all these cases.

> Don't think it is not possible to make a mistake on the issue of guilt or innocence. It is absolutely possible. So, if you think there is any possibility based on the evidence as you heard it, that there is a possibility that someone else did this, there is a possibility that Tamara Llamas is a liar, then your last chance to avoid possibly causing an innocent person to be put to death is

---

[28] *Franklin v. Lynaugh*, 487 U.S. 164, 174 (1988).

today. And you may consider those things as circumstances of this offense.

And you don't have - - all of you do not have to agree on what mitigation is. It is if there are five of you that think the fact that we can take him out of drug society is mitigation and five of you worried about the evidence, you-all don't have to agree on what it is, as long as there are 10 of you.

I would ask you to seriously, seriously look into your hearts and consider those things before you answer this question.

Thank you, ladies and gentlemen.

Irvan was able to argue his "residual doubt" claim to the jury, which could have given mitigating effect to any "residual doubt" in answering the special issues.[29] Point of error sixteen is overruled.

## TEXAS DEATH-PENALTY STATUTE

In his final two points of error, Irvan argues that the Texas death-penalty statute violated his rights under the Eighth Amendment to the United States Constitution. In point of error seventeen, Irvan alleges that "the absence of a third sentencing alternative of life without parole" did not allow the jury to give effect to his mitigating evidence. In point of error eighteen, he contends that he "was sentenced to death upon less than proof beyond a reasonable doubt of the continuing threat special issue, because the Texas [d]eath penalty statute did not provide jurors with the sentencing option [of] life without parole."

The Texas capital-murder statute is not unconstitutional for failing to provide an

---

[29] *Blue v. State,* 125 S.W.3d 491, 502-503 (Tex. Crim. App. 2003).

optional penalty of life without parole.[30] The lack of a life without parole option did not preclude the jury from giving effect to Irvan's mitigating evidence. The death-penalty statute also provides that the State must prove the future-dangerousness special issue beyond a reasonable doubt.[31] Points of error seventeen and eighteen are overruled.

We affirm the judgment of the trial court.

Delivered: June 7, 2006.
Do Not Publish

---

[30] *Arnold v. State,* 873 S.W.2d 27, 39-40 (Tex. Crim. App. 1993).

[31] Art. 37.0711, § 3(c).