NUMBER 13-09-00677-CV

 

COURT OF APPEALS

 

THIRTEENTH DISTRICT OF TEXAS

 

                                  CORPUS
CHRISTI - EDINBURG

 




 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 


 



IN THE INTEREST OF A. D. M., A CHILD

 

 



On appeal from the 107th District Court

of Cameron County, Texas.

 

 



     MEMORANDUM OPINION

 

Before Chief Justice Valdez and Justices Rodriguez
and Vela

Memorandum Opinion by Chief Justice
Valdez

            Appellants, the Office of the Attorney General
(“OAG”) and Darlene Ramos, appeal the trial court’s order adjudicating that appellee,
Leobardo Araguz, is not the father of Ramos’s child, A.D.M.  By four issues, which
we have renumbered and reorganized, appellants contend that:  (1) the evidence
is legally and factually insufficient to show that A.D.M. had a presumed father
at the time Araguz asserted his limitations defense; (2) assuming A.D.M. had a
presumed father, application of the statute of limitations in section
160.607(a) of the family code in this case violates the Texas constitution’s
prohibition on retroactive laws; (3) the OAG had the authority and standing to
bring a lawsuit to adjudicate A.D.M.’s parentage; and (4) the trial court
should have granted their motions for paternity testing.[1]  By two sub-issues,
Ramos contends that the trial court erred in concluding that Araguz is not
A.D.M.’s father and that she is not entitled to attorney’s fees.  We affirm.

I.          Procedural History

            On August 26, 1995, Ramos gave
birth to A.D.M.  On November 1, 2001, the OAG filed suit in the 357th Judicial
District Court of Cameron County, Texas against Joe Martinez, claiming that he
was A.D.M.’s father and requesting child support.[2]  Martinez
submitted to genetic testing requested by the OAG, and on November 5, 2001, the
results established that Martinez is not A.D.M.’s biological father.  The OAG
then filed suit against Araguz in the 107th Judicial District Court of Cameron
County, Texas on November 29, 2001 claiming that he was A.D.M.’s father.  On
January 3, 2002, the 357th District Court concluded that Martinez is not
A.D.M.’s father and signed an agreed order dismissing with prejudice the OAG’s
paternity suit against Martinez.

            The OAG then filed a motion for
order of parentage testing seeking to establish that Araguz is A.D.M.’s
biological child.[3] 
On April 2, 2002, Araguz filed his first amended original answer raising the
statute of limitations as an affirmative defense to the OAG’s cause of action. 
The trial court held a hearing on the OAG’s motion and then denied it.  The OAG
filed a motion for rehearing, which the trial court denied after a hearing.

            On April 17, 2006, Ramos filed
a document entitled “Petition for Intervention” seeking to establish Araguz’s
status as A.D.M.’s biological father.  Ramos filed a motion for parentage
testing, which the trial court denied.[4] 
Appellants then filed a petition for writ of mandamus asking this Court to
order the trial court to grant genetic testing of Araguz.  After this Court
denied appellants’ petition for writ of mandamus, the 107th District Court held
a bench trial.  The OAG presented the testimony of among others, Araguz, Ramos,
Martinez, Julissa Araguz, Aurora Quiroz, and Francisco Quiroz; Araguz presented
the testimony of Abel Toscano III.

After hearing the
evidence, the trial court signed an order stating that Araguz “has not been
proven to be the father of the child [A.D.M.].”  Appellants requested findings
of fact and conclusions of law.  The trial court entered the following
pertinent findings of fact:

. . . .

4.           
This suit was filed against [Araguz] when the child was 6 years and 3
months old.

 

5.           
This suit was filed against [Araguz] after the enactment of § 160.607(a)
of the Texas Family Code which provides that a proceeding to adjudicate the
parentage of a child having a presumed father shall be commenced not later than
the fourth anniversary of the date of the birth of the child.

 

6.           
At the time of the conception of the child, [A.D.M.], Respondent
[Ramos], mother of the child, was married to [Martinez] in accordance with §
2.401 of the Texas Family Code.

 

7.           
At the time of the birth of the child, [A.M.D.], Respondent [Ramos],
mother of the child was married to [Martinez] in accordance with § 2.401 of the
Texas Family Code.

 

8.           
At the time of the filing of this suit against Respondent, [Araguz],
[Martinez] was the presumed father of the child in accordance with § 160.204 of
the Texas Family Code.

 

9.           
During the probable time of conception of the child, the presumed
father, [Martinez], and the mother of the child, [Ramos] lived together and
engaged in sexual intercourse with each other.

 

10.        
At the time of the birth of the child, [Ramos] mother of the child,
named the child [A.D.M.], giving the child the last name of [Martinez].

 

11.        
At all times after the birth of the child and up to the filing of this
suit against Respondent, [Araguz], both the mother of the child, [Ramos], and
the father of the child, [Martinez], represented to others that the child was
the child of [Martinez].

 

12.        
At all times after the birth of the child and up to the filing of this
suit against Respondent, [Araguz], [Ramos] and [Martinez] represented to others
that [A.D.M.] was their second child together, their first child being
[A.B.R.], born June 29, 1988.

 

13.        
[Ramos] and [Martinez] lived together as husband and wife continuously
from 1988 until 1999.

 

14.        
No divorce proceeding or judicial, administrative, or other legal
proceeding was instituted by either [Ramos] or [Martinez] to end or disclaim
their marriage prior to this suit being filed against [Araguz].

 

15.        
[Araguz] was not a party to nor given any notice of any divorce
proceeding or judicial administrative, or other legal proceeding instituted by
either [Ramos] or [Martinez] to end or disclaim their marriage prior to 2009 or
prior to any such proceeding being finalized.

 

.
. . .

 

18.        
The limitations period set out in § 160.607(a) barred the filing of this
suit on November 29, 2001 against Respondent, [Araguz] when the child the
subject of this suit was over 6 years old at the time of the filing of this
suit.

 

19.        
[Martinez’s] presumption of paternity of the child the subject of this
suit could only be rebutted by an adjudication of parentage in accordance with
Subchapter G if Chapter 160 of the Texas Family Code or the filing of a valid
denial of paternity by a presumed father in conjunction with the filing by
another person of a valid acknowledgment of paternity as provided by § 160.305
of the Texas Family Code.

 

20.        
No filing of a valid denial of paternity by [Martinez] in conjunction
with the filing by another person of a valid acknowledgment of paternity as
provided by § 160.305 of the Texas Family Code was ever filed regarding the
child the subject of this suit.

 

21.        
Pursuant to § 160.602 of the Texas Family Code, the time period to file
suits adjudicating the parentage of a child having a presumed father set out in
§ 160.607 of the Texas Family Code also applies to suits brought by the support
enforcement agency or another government agency authorized by other law.

 

22.        
The State of Texas, the
support enforcement agency, brought suit to adjudicate parentage of the child
[A.D.M.] against [Martinez] the presumed father of the child after the 4th
birthday of the child and after the enactment of § 160.607 of the Texas Family
Code, in Cause No. 2001-11-4703-E in the 357th District Court of
Cameron County, Texas.

 

23.        
Respondent [Martinez], the presumed father of the child, in Cause No.
2001-11-4703-E in the 357th District Court of Cameron County, Texas,
was not served in such suit until December 12, 2001, and such suit was still
pending and had not been adjudicated at the time of the filing of this suit by
the State of Texas against Respondent [Araguz] on November 29, 2001.

 

.
. . .

 

31.        
At the time of the institution of the suit by the State of Texas against Respondent
[Araguz] in this cause on November 29, 2001, [Martinez] was the presumed father
of the child, [A.D.M.], and there was an established father-daughter
relationship between [Martinez] and [A.D.M.], and an established
grandparent-grandchild relationship between [Martinez’s] parents and the child
[A.D.M.].

 

32.        
[Martinez’s] parentage regarding the child [A.D.M.] was not adjudicated
until January 3, 2002, after the institution of this suit against Respondent
[Araguz] on November 29, 2001.

 

33.        
Pursuant to § 160.204(b), [Martinez’s] presumption of paternity of the
child [A.D.M.] was not rebutted until January 3, 2002.

 

34.        
This suit to adjudicate parentage was filed by the State of Texas against Respondent
[Araguz] prior to the adjudication of [Martinez’s] parentage of the child
[A.D.M.].

 

35.        
This suit to adjudicate parentage was filed by the State of Texas against Respondent [Araguz]
prior to the adjudication of [Martinez’s] parentage of the child [A.D.M.] was
barred by § 160.607 of the Texas Family Code.

 

36.        
This suit to adjudicate parentage was filed by the State of Texas against Respondent
[Araguz] without authority of law.

 

37.        
The State of Texas had no standing to file this suit to adjudicate
parentage against Respondent [Araguz] on November 29, 2001.

 

38.        
Respondent, [Ramos], had a history and pattern of lying regarding the
identity of the biological father of [A.D.M.].

 

39.        
Respondent, [Ramos’s] testimony at trial was not credible.

 

40.        
Any finding of fact that is a conclusion of law shall be deemed a
conclusion of law.

 

The trial court made the following conclusions of law:

1.           
Respondent [Araguz] is not the father of the child [A.D.M.].

 

2.           
This Court is not barred by any other fact finding or judgment issued in
any other proceeding by another court in another cause instituted by [Ramos] or
[Martinez] after the institution of this cause.

 

This appeal ensued.

II.         The Evidence

A.        Araguz

            On direct examination by the
OAG, Araguz admitted that he had “sexual relations” with Ramos on approximately
ten occasions; however, he did not remember when those “sexual relations”
occurred or if he had sex with her in 1994.  Araguz did not recall whether he
used contraception when he had sex with Ramos.

            On cross-examination by Ramos’s
attorney, Araguz stated that he was not denying the possibility that he is
A.D.M.’s father.  Araguz agreed that he did not know of any other person who
could possibly be A.D.M.’s father besides himself.  Araguz acknowledged that he
did not have a reason to agree or disagree with the allegation that he had sex
with Ramos in 1994 because he could not recall the dates he had sex with her.

            Araguz testified that when he
had a sexual relationship with Ramos, Ramos told him that she was married to
Martinez.  Araguz testified that during the entire time of his relationship
with Ramos, she lived with Martinez.  Araguz believed that Ramos was committing
adultery with him.

B.        Ramos

On direct examination
by the OAG, Ramos testified that she lived with Martinez “on and off” from 1989
until 1999.  On cross-examination by her attorney, Ramos claimed that the
longest period of time she and Martinez lived together was one year.

            According to Ramos, she only had sex with Araguz
and Martinez during “the period of possible conception,” which was
approximately in November 1994.  However, Ramos claimed she always believed
that Araguz was A.D.M.’s father.  Ramos stated that A.D.M. resembles Araguz
because she has “his height, his eyebrows, his nose, lips, the way she stands,
and she’s very athletic.”  According to Ramos, A.D.M. plays basketball,
volleyball, soccer, and softball; A.D.M. would like to play football.

On cross-examination by Araguz’s
attorney, Ramos admitted that although at the time A.D.M. was born she did not
believe Martinez was A.D.M.’s father, she told Martinez that he was the father. 
Ramos testified that genetic testing established that Martinez is not A.D.M.’s
biological father.  Ramos acknowledged that there was a court order stating
that Martinez was not A.D.M.’s father.  Ramos did not provide a name for
A.D.M.’s father on her birth certificate—it was left blank.  However, Ramos did
give A.D.M., Martinez’s last name.

            Ramos stated that although she referred to her
relationship with Martinez as a common law marriage, she never intended to be
married to Martinez.  Ramos explained that she thought her relationship with
Martinez was a common law marriage because they lived together, they bought a
house together, and “people would say that was considered common-law. . . .”[5]  Ramos and
Martinez did not file for a divorce when the relationship ended.  Ramos stated
that she did not use Martinez’s name on any legal documents and she never filed
a tax return with Martinez.  Ramos claimed that she did not have a wedding ring
from Martinez and that they did not celebrate an anniversary.

            On cross-examination by Araguz’s attorney, Ramos
testified that “sometimes” she and Martinez told people they were common-law
married and she introduced him as her husband and he introduced her as his
wife.  Although Ramos denied telling other people that Martinez was A.D.M.’s
father, she admitted that she “represented” to Martinez’s parents that A.D.M.
was their granddaughter.  Ramos agreed that she represented herself as
Martinez’s common law wife from 1989 until 1999 when the relationship ended.

C.        Martinez[6]

            Martinez testified that he and
Ramos lived together for approximately seven to nine years; however, because
the relationship was “off and on,” Martinez claimed “[t]here was never a
consistent year between [the two].”  According to Martinez, he and Ramos only
discussed getting married when they first began their relationship; but they
never discussed marriage again because of the many periods of separation. 
Martinez stated that Ramos did not use Martinez as her name, and when they
signed the deed to the house they purchased together, she used Ramos. 
According to Martinez, the couple filed separate individual tax returns, and
when the relationship ended they did not seek a divorce.

            Martinez testified on
cross-examination by Araguz’s attorney that he sometimes introduced Ramos as
his wife and she sometimes introduced him as her husband.  When asked if the
couple had decided that they were married or not married, Martinez replied:

We just assumed that in the State of Texas that we would
be common-law, you know.  That’s—we assumed—we were told by various people that
if you lived together, you would be considered common-law married; so that’s
what we based it on.  But as far as marriage, going back to that question, only
in the earlier part of our relationship.

 

            Martinez stated that Ramos did
not change her name because they were under the impression that she could not
change her name unless they were married by the church or the justice of the
peace.  Martinez testified that if he had known that Ramos was allowed to
legally change her name to his, there is a possibility the situation would have
been different; and he did not “see” a reason why Ramos would not have changed
her name to Martinez.  According to Martinez, there was a possibility that the
couple would have filed joint tax returns if he had known they did not need a
document from a church or justice of the peace stating they were married.  Martinez
did not know that a divorce was required if a couple is considered to be in a
common law marriage.  

Martinez testified
that Ramos told him that he was A.D.M.’s father and that he believed that A.D.M.
was his biological daughter until October 29, 2001, when the results of a
genetic test revealed he was not biologically related to A.D.M.[7]  According to
Martinez, the OAG requested genetic testing, and he never requested it.  The OAG
agreed to dismiss its suit against Martinez with prejudice.[8]

D.        Aurora Quiroz

Aurora, Araguz’s mother,
testified that she met Ramos when Ramos visited Aurora’s daycare because Ramos
was considering enrolling her child there.[9] 
Aurora stated that she does not have a relationship with Ramos and that she had
not seen A.D.M. until she was subpoenaed to testify in this case.  Aurora said
that she had never attended any events or parties held for A.D.M.  Aurora
stated that she has never told anyone that A.D.M. is Araguz’s daughter and that
no one has ever told her that A.D.M. is Araguz’s daughter.[10]  Aurora did not
remember if she attended an event for A.D.M. depicted in petitioner’s exhibit
number four, but she did recognize Julissa, her daughter, in the picture.[11]  According to
Aurora, she first discovered that A.D.M. existed when this suit was filed
against Araguz.  When asked if she attended A.D.M.’s first and second birthday
parties, Aurora replied that she did not remember.

E.        Francisco Quiroz

            Francisco, Araguz’s stepfather, testified that
he did not know Ramos and that he had not met her in the past.  Francisco
stated that he did not know A.D.M. and that he had not seen her until the trial
began.  When asked if he had attended a birthday party for A.D.M. and if he had
ever been to Martinez’s home, Francisco replied that he did not remember. 
Francisco stated that he did not want to know if A.D.M. was his granddaughter.

            On cross-examination, Ramos’s attorney asked
what Araguz had said concerning the lawsuit.  The following exchange occurred:

[Francisco]:               That
he was being sued because that probably this lady’s child was his.

 

[Ramos’s
counsel]:  So[,] he expressed to you that he believed that probably this baby
was his daughter?

 

[Francisco]:               That’s what I answered you.

 

. . . . 

 

[Ramos’s
counsel]: There was an admission to you that he was probably the father,
correct?

 

[Francisco]:               Well, I don’t look at it that
way.

 

[Ramos’s counsel]:  Well, he said he was probably the
father, correct?

 

[Francisco]:               Well,
that’s one of the things—that’s one of the reasons that we’re here, aren’t we?

 

[Ramos’s
counsel]:  No, sir.  I’m asking you to make sure we understood your testimony
that you said—that [Araguz] told you that he was probably the father of the
little girl.

 

[Francisco]:               That’s
what I told you before.

On cross-examination by Araguz’s attorney, Francisco stated
that Araguz had not told him that he was A.D.M.’s father, and he claimed that
he misunderstood the questions previously asked by Ramos’s attorney.

F.         Julissa Araguz

            Julissa, Araguz’s sister, testified that Ramos
was her friend from “many years ago” and that she did not remember how they
met.  Julissa did not remember how often she talked to Ramos, if she went out
with Ramos or anything that she did with Ramos.  Julissa recalled that she was
pregnant with her son when Ramos was pregnant with A.D.M.  However, Julissa
could not remember if they ever discussed their pregnancies with each other.

Julissa stated that she was unaware
of Ramos’s and Araguz’s sexual relationship and that Ramos never told her about
their relationship.  Julissa stated that Ramos did not tell her that Araguz was
A.D.M.’s father.[12] 
Julissa said that Ramos told her that Ramos had a husband named Joe and
children.  Julissa did not remember Joe’s last name.

Julissa believed that it was
possible that she visited A.D.M. after she was born and that she attended
A.D.M.’s birthday party; but Julissa could not remember doing so.  Julissa
stated that she never acknowledged A.D.M. as being Araguz’s child and never
told anyone that A.D.M. was his child.  No one ever told Julissa that A.D.M.
was Araguz’s child, and she never discussed the issue with Ramos or Araguz.  Julissa
stated that she never talked to her parents or Araguz about the case.  When
asked if she wanted to know if A.D.M. was Araguz’s daughter, Julissa responded,
“It doesn’t matter.”

III.        Legal and Factual Sufficiency

            By
the first issue, appellants contend that Martinez was not A.D.M.’s presumed
father.  Specifically, appellants argue that (1) the evidence is legally and
factually insufficient to support a finding that Ramos and Martinez had a
common law marriage and (2) even if at one time Martinez was A.D.M.’s presumed
father, that presumption had been rebutted and or destroyed by genetic testing
when Araguz asserted his statute of limitations defense; therefore, the trial
court “should have rejected it [Araguz’s statute of limitations defense].”

A.        Standard of Review

We may sustain a challenge to the legal sufficiency of
the evidence only when:  (1) the record discloses a complete absence of
evidence of a vital fact; (2) the court is barred by rule of law or of evidence
from giving weight to the only evidence offered to prove a vital fact; (3) the
evidence provided to prove a vital fact is no more than a mere scintilla; or
(4) the evidence establishes conclusively the opposite of a vital fact.  City of Keller v. Wilson, 168
S.W.3d 802, 810-11 (Tex. 2005).  “[W]hen the
evidence offered to prove a vital fact is so weak as to do no more than create
a mere surmise or suspicion of its existence, the evidence is less than a
scintilla and, in legal effect, is no evidence.”  Ford Motor Co. v. Ridgway, 135 S.W.3d 598, 601 (Tex.
2004).  But more than a scintilla of evidence
exists if the evidence rises to a level that would enable reasonable and
fair-minded people to differ in their conclusions.  Id.

            In our legal sufficiency
review, we review the evidence in the light favorable to the finding, crediting
favorable evidence if a reasonable fact-finder could and disregarding contrary
evidence unless a reasonable fact-finder could not.  City of Keller,
168 S.W.3d at 807.  The final test for legal
sufficiency is whether the evidence presented at trial would enable reasonable
and fair-minded people to make the finding under review.  Id. at
827.

When
reviewing the evidence for factual sufficiency, we consider and weigh all of
the evidence in a neutral light and conclude that the finding is not supported
by sufficient evidence only if the finding is so contrary to the overwhelming
weight of the evidence as to be clearly wrong and unjust.  Cain v.
Bain, 709 S.W.2d 175, 176 (Tex. 1986) (per curiam).  We must “detail the evidence relevant to the issue” and “state in what
regard the contrary evidence greatly outweighs the evidence in support of the
verdict.”  Dow Chem. Co. v. Francis, 46 S.W.3d 237, 242 (Tex.
2001) (per curiam).

B.        Common Law Marriage

            A common law marriage exists in Texas if the parties: 
(1) agreed to be married; (2) lived together in Texas as husband and wife
subsequent to the agreement to be married; and (3) represented to others in
Texas that they were married.  See Tex.
Fam. Code Ann. § 2.401(a)(2) (West 2006).  A common law marriage does
not exist until the concurrence of all three elements.  Winfield v. Renfro,
821 S.W.2d 640, 645 (Tex. App.—Houston [1st Dist.] 1991, writ denied).  An
agreement to be married requires that “the parties intended to have a present,
immediate, and permanent marital relationship and that they did in fact agree
to be husband and wife.”  Eris v. Phares, 39 S.W.3d 708, 714 (Tex. App.—Houston
[1st Dist.] 2001, pet. denied).  The agreement to be married may be established
by direct or circumstantial evidence.  Russell v. Russell, 865 S.W.2d
929, 933 (Tex. 1993).  The conduct of the parties as well as proof of
cohabitation and representations to others may constitute circumstantial
evidence of an agreement to be married depending upon the facts of the case.  Id. 
Cohabitation need not be continuous.  See Bolash v. Heid, 733 S.W.2d
698, 699 (Tex. App.—San Antonio 1987, no writ); see also McCaskill v.
McCaskill, No. 13-08-00122-CV, 2009 Tex. App. LEXIS 7998 (Tex. App.—Corpus
Christi Oct. 15, 2009, pet. denied) (mem. op.).  Whether a common law marriage exits
is a question of fact.  Weaver v. State, 855 S.W.2d 116, 120 (Tex.
App.—Houston [14th Dist.] 1993, no pet.).

            On appeal, appellants challenge the first
element of a common law marriage arguing that the evidence was legally and
factually insufficient to support the trial court’s finding that Ramos and
Martinez agreed to be married.  Appellants do not argue that Ramos and Martinez
failed to hold themselves out as a married couple.[13]  See Tex. Fam. Code Ann. § 2.401.

            In this case, there was circumstantial evidence
that Ramos and Martinez agreed to be married because both parties testified
that they had cohabitated and had held out to others that they were husband and
wife.  Although appellants emphasize that Ramos did not change her last name to
Martinez and that the couple did not file tax returns together or sign a deed
as husband and wife, Martinez explained that they were under the impression
that a couple married by common law could not file tax returns together and
that Ramos could not change her name to Martinez.  Martinez also stated that
had the couple known that a common law marriage was valid in Texas, they would
have filed their tax returns together and that Ramos would have changed her
name to Martinez.  It appears that the couple were not aware that a common law
marriage is a valid form of marriage in Texas; however, whether the couple
believed that their marriage was valid or invalid does not negate the fact that
there was evidence presented that they agreed to enter into a common law
marriage.  Therefore, viewing the evidence in the light most favorable to the
trial court’s finding, we conclude that the evidence was legally sufficient.  See
City of Keller, 168 S.W.3d at 807.  Moreover,
weighing all of the evidence in a neutral light we cannot conclude that the
finding is so contrary to the overwhelming weight of the evidence as to be
clearly wrong and unjust.  See Cain, 709 S.W.2d at 176.  Accordingly, we conclude that evidence was
legally and factually sufficient to establish that Ramos and Martinez agreed to
be married.  Thus, the trial court’s finding that at the time A.D.M. was
conceived, Ramos and Martinez were married is supported by the evidence.  See
Tex. Fam. Code Ann. § 2.401.

C.        Presumed Father

Furthermore, there exists a
presumption of paternity if a man is married to the mother of the child and the
child is born during the marriage.  Id. § 160.204(a) (West 2008).  This
presumption legally establishes the father-child relationship between the man
and child.  Id. at § 160.201(b)(1) (West 2008).  A “presumed father” is,
by operation of law under section 160.204, “recognized as the father of the
child until that status is rebutted or confirmed in a judicial proceeding.”  Id.
at § 160.102(13) (West 2008); In re S.C.L., 175 S.W.3d 555, 557 (Tex.
App.—Dallas 2005, no pet.).

            As set out above, the trial court’s finding that
Ramos and Martinez were married when A.D.M. was born is supported by the
evidence.  Therefore, viewing the evidence appropriately, the evidence is
sufficient to support a finding that Martinez was A.D.M.’s presumed father when
appellants commenced the cause against Araguz.  We overrule appellants’ first
issue.

D.        Rebuttal of Presumption

            Appellants also argue that the presumption that
Martinez is A.D.M.’s father had been rebutted when Araguz asserted his statute
of limitations defense.  Therefore, according to appellants, the statute of
limitations could not have barred their cause of action against Araguz.  We
disagree.

            Section 160.607 of the family code bars the
commencement of a paternity cause of action four years after the child’s birth
if the child has a presumed father.  See Tex. Fam. Code Ann. § 160.607 (West 2008).  When appellants
commenced the cause of action, there had been no adjudication with respect to
Martinez’s paternity.  Therefore, the trial court found that at the
commencement of appellants’ cause of action Martinez was A.D.M.’s presumed
father.  Viewing the evidence in the light most favorable to the trial court’s
finding, we cannot conclude that the evidence was legally insufficient to
support the trail court’s finding, see City of Keller, 168 S.W.3d
at 807; and viewing the evidence in a neutral light, we cannot conclude that
the finding is so contrary to the overwhelming
weight of the evidence as to be clearly wrong and unjust.  See Cain,
709 S.W.2d at 176.  Moreover, because appellants commenced the paternity cause
of action against Araguz outside the limitations period, we cannot conclude, as
appellants request, that the trial court “should have rejected [Araguz’s statute
of limitations defense].”

E.        Sub-issues

By a sub-issue, Ramos contends that
the evidence was legally and factually insufficient to show that Araguz is not
A.D.M.’s father; therefore, she was entitled to attorney’s fees.[14]  We disagree.

The trial court found that Ramos
was not credible; and therefore, presumably it did not believe her assertions
that she only had sex with Araguz and Martinez when A.D.M. was conceived. 
Although Araguz admitted that it was possible that he was A.D.M.’s father, this
evidence is so weak as to do no more than create a mere surmise or suspicion of
its existence.  Ridgway, 135 S.W.3d at 601.  Therefore, it is less than
a scintilla of evidence to support a conclusion that Araguz is A.D.M.’s
biological father.  See id.  After viewing the evidence in the light
most favorable to the trial court, we conclude the evidence was legally
sufficient to support the trial court’s finding that Araguz is not A.D.M.’s
biological father.  See City of Keller, 168 S.W.3d at 807.  Furthermore,
after weighing all of the evidence in a neutral
light, we cannot conclude that the finding is so contrary to the overwhelming
weight of the evidence as to be clearly wrong and unjust.  See Cain, 709 S.W.2d at 176. 
Therefore, the evidence was factually sufficient to support the trial court’s
finding that Araguz is not A.D.M.’s father.

Having concluded that the evidence
was legally and factually sufficient to support the trial court’s finding that
Araguz is not A.D.M.’s father, to the extent Ramos is arguing that she is
entitled to attorney’s fees because the evidence supported a finding that
Araguz is A.D.M.’s biological father, we overrule Ramos’s sub-issue.

IV.       Retroactive Law

By the second issue, appellants’
contend that their paternity lawsuit is not barred by section 160.607(a) of the
Texas Family Code stating that “a proceeding brought . . . to
adjudicate the parentage of a child having a presumed father shall be commenced
no later than the fourth anniversary of the date of the birth of the child.”  See
Tex. Fam. Code Ann. § 160.607(a)
(Vernon 2008).  Section 160.607(a) was signed by the governor on June 14, 2001,
and it became effective immediately.  A.D.M. was five when the statute became
effective; therefore, it was impossible for A.D.M. to comply with the
limitations period.   Appellants argue, therefore, that 160.607(a) is
unconstitutionally retroactive, as applied to A.D.M., because the statute took
effect immediately and the legislature failed to provide a reasonable time for
them to file the lawsuit on A.D.M.’s behalf.  See Tex. Const. art. I § 16.

Article I, section 16 of the Texas
Constitution states that “[no] bill of attainder, ex post facto law,
retroactive law, or any law impairing the obligation of contracts, shall be
made.”  Tex. Const. art. I, § 16. 
 The presumption in Texas is against retroactivity, which fulfills two
objectives as stated by the Texas Supreme Court:  (1) to protect the people’s
reasonable, settled expectations; and (2) to protect against the abuses of
legislative power.  Robinson v. Crown Cork & Seal Co., Inc., 335
S.W.3d 126, 139 (Tex. 2010) (citing Landgraf v. USI Film Products, 511 U.S.
244, 265 (1994)).  Although a statute of limitations is procedural and
generally applies retroactively, it will not be given retroactive effect if
doing so destroys or impairs a right that vested before the effective date of
the statute.  Id. at 141; In re K.N.P., 179 S.W.3d 717, 720 (Tex.
App.—Fort Worth 2005, pet. denied).

Although the courts of this State
have analyzed whether a statute is unconstitutionally retroactive by determining
whether the law impairs vested rights—the vested rights test—the Texas Supreme
Court in its plurality opinion Robinson v. Crown Cork & Seal Co.,
attempted to abolish the vested rights test.  Robinson, 335 S.W.3d at
147.  In that case, the court stated that

[n]o bright-line test for unconstitutional retroactivity
is possible.  Rather, in determining whether a statute violates the prohibition
against retroactive laws in article I, section [16] of the Texas Constitution,
courts must consider three factors in light of the prohibition's dual
objectives:  the nature and strength of the public interest served by the
statute as evidenced by the Legislature's factual findings; the nature of the
prior right impaired by the statute; and the extent of the impairment.  The perceived
public advantage of a retroactive law is not simply to be balanced against its
relatively small impact on private interests, or the prohibition would be
deprived of most of its force.  There must be a compelling public interest to
overcome the heavy presumption against retroactive laws.

 

Id. at 145-46.  In Robinson, the majority of
the court agreed to reverse the lower court’s judgment, concluding that the
complained-of statute was not unconstitutionally retroactive; however, the
justices did not agree on the proper analysis supporting reversal.  Id. 
Three justices concluded that the vested rights test should be abolished while the
three concurring justices applied the vested rights test.  Id. at 147,
150-51 (Medina J., concurring) (declining to apply the vested rights test and
instead applying the above factors to determine whether the complained-of
statute was unconstitutionally retroactive as applied to the appellants), 151. 
The two dissenting justices agreed with the concurring justices that the vested
rights test applied but concluded that the complained-of statute had not
impaired a vested right.  Id. at 170, 192 (Wainwright J., dissenting). 
Therefore, the court’s opinion itself has very limited precedential value and
would control the result only in identical cases.  See Univ. of Tex.
Med. Branch v. York, 871 S.W.2d 175, 176 (Tex. 1994).

In this case, we will determine
whether section 160.607(a) is unconstitutionally retroactive in this case by applying
both tests—the vested rights test and the Robinson test.  Under each
test, our focus is on protecting reasonable, settled expectations and
protecting against the abuses of legislative power.  Robinson, 335
S.W.3d at 139; see id. at 151 (Medina J., concurring) (“Along the way,
the [court’s Robinson opinion] grapples with the nature of the
underlying property interest and its impairment, ultimately concluding that the
Robinsons possessed a substantial interest in a well-founded claim (dare I say
a vested property right) that Chapter 149 retroactively impaired.  Although the
Court is reluctant to use the term ‘vested rights,’ preferring instead to speak
of ‘settled expectations,’ I believe we are talking about the same thing.”).  And,
under each test, the result of our analysis should be the same.  See Robinson,
335 S.W.3d at 146.

            We must first consider the nature of the rights
claimed by appellants and section 160.607(a)’s impact on them.  See id. 
At trial, Araguz admitted that it is possible that he is in fact A.D.M.’s
biological father.  However, Ramos admitted that although she engaged in sexual
intercourse with Araguz and Martinez during the period that she conceived
A.D.M., she lied to Martinez for six years by telling him that he was A.D.M’s
biological father.  Moreover, Ramos claimed that she informed Araguz that he
was possibly A.D.M.’s father when she gave birth to A.D.M.; however, she did
not commence a paternity suit against him at that time and instead waited until
A.D.M. was approximately ten years’ old.[15] 
Although appellants claim that the statute of limitations has prevented the
suit against Araguz, it appears the reason that no suit was filed against
Araguz is because Ramos continued to deceive Martinez and everyone else
concerning the identity of A.D.M.’s father.[16] 
Moreover, the trial court found that Ramos’s testimony was not credible. 
Therefore, it may have disbelieved her when she stated that she informed Araguz
that he was A.D.M.’s father when the child was born.

The purpose of a statute of
limitations in cases where a child has a presumed father is to avoid the
severance of the parent-child relationship between the child and the presumed
father—the psychological father.  In this case, Martinez did not challenge his
paternity of A.D.M. and at the hearing stated that he still considers A.D.M. to
be his daughter—although not biological—because there was a strong parent-child
bond.  According to Martinez, his bond with A.D.M. was still so strong he had
not informed his parents that A.D.M. was not his biological daughter.  A.D.M.
had an established father-daughter relationship with Martinez—her presumed
father.  The fact that the OAG required a paternity test of Martinez despite
the fact that Martinez had never challenged his paternity of A.D.M. created the
current situation.  In fact, Martinez testified that he did not request the
paternity test.  The reason that the OAG decided to get a paternity test of
Martinez is unknown.

Legally, there is a presumption
that a man is the child’s father, regardless of biology, if he was married to
the mother of the child and the child was born during that marriage.  See
Tex. Fam. Code Ann. § 160.204. 
Martinez was married to Ramos when A.D.M. was born—thus, he was A.D.M.’s legal
father.  See id.  The family code does not require a paternity test in
cases where a child has a presumed father.  See id.  Therefore, considering
the nature of the right that the OAG and Ramos are attempting to assert—the
right to determine the identity of A.D.M.’s father—we conclude that section
160.607(a) would not have been significantly impacted that right because
Martinez accepted responsibility for A.D.M.  See Robinson, 335 S.W.3d at
148.  It was the OAG that interfered with that relationship and caused the
severance through the paternity test.[17]

We next consider the nature and
strength of the public interest served by retroactive application of section
160.607(a).  See id. at 148-49.  Section 160.607(a) prevents a mother, a
presumed father, or any other individual, including the biological father, from
destroying the father-child relationship between a presumed father and the
child.  See In re S.C.L., 175 S.W.3d 555, 560 (Tex. App.—Dallas 2005, no
pet.).  The purpose of the Uniform Parentage Act (the “UPA”), which the Texas
Legislature adopted in 2001, is to protect the child involved in parentage
issues.[18] 
The Texas legislature did not set out in its legislative history the policy
reasons behind its adoption of the UPA.  It is, however, apparent that Texas
has an interest in protecting children involved in parentage issues and that
the legislature adopted the UPA to promote the uniformity of the law among the
states on issues concerning parentage.  See Tex. Fam. Code Ann. § 160.001 (West 2008) (“[The UPA] shall
be applied and construed to promote the uniformity of the law among the states
that enact [it].”).  A statute of limitations in cases where the child has a
presumed father usually protects a child because it preserves the established
family unit.  See In re Rodriguez, 248 S.W.3d 444, 454 (Tex. App.—Dallas
2008, orig. proceeding); see also In re R.O., No. 03-04-00506-CV, 2005
Tex. App. LEXIS 2990, at *14 (Tex. App.—Austin Apr. 21, 2005, no pet.) (mem.
op.).

            In this case, there is an overriding public
policy of preserving the A.D.M.’s family relationship with Martinez.  Allowing
section 160.607(a) to bar this cause of action against Araguz furthers the public
interest of preserving the relationship between Martinez and A.D.M.  The trial
court found that when appellants commenced the suit against Araguz, Martinez
was A.D.M.’s presumed father and that that presumption had not been rebutted.  The
evidence supported that finding.  Martinez has raised A.D.M. as his own child
since birth.  He is the only father she has ever known.[19]  Moreover,
there is no guarantee that a paternity test will reveal that Araguz is in fact
A.D.M.’s father; and Araguz and his family have indicated that they do not want
a relationship with A.D.M.[20] 
Therefore, we conclude that the compelling public interest of preserving the
father-child relationship between the presumed father (Martinez) and the child (A.D.M.)
overcomes the heavy presumption against retroactive application of section
160.607(a) in this case.  Robinson, 335 S.W.3d at 145-46.

            We also conclude that the result is the same
under the vested rights test.  A statute of limitations is unconstitutionally
retroactive only if it bars an existing claim.  In this case, appellants did
not have an existing claim against Araguz when section 160.607(a) was enacted
because Ramos continued to deceive Martinez and A.D.M. concerning Martinez’s
status as A.D.M.’s biological father.  We conclude that appellants’ did not
have a cause of action against Araguz until Ramos made her claim that he was possibly
A.D.M.’s father.  See Robinson, 335 S.W.3d at 171 (Wainwright, J.,
dissenting) (“For, at the core of the vested rights doctrine lies an extremely
important principle—the constitutional retroactivity doctrine does not protect
an asserted entitlement to property one does not own, and until a final
judgment in a case, we do not know whether the lawsuit will prove or refute a
claim to recover.”).  The trial court found that when appellants filed suit
against Araguz, Martinez had not been adjudicated not to be A.D.M.’s father. 
Therefore, the presumption that Martinez was A.D.M.’s father had not been
rebutted when appellants commenced their suit against Araguz.

The trial court did not believe that
Ramos informed Araguz that he was A.D.M.’s father when she was born, and Ramos
did not commence a paternity action against him at that time.  Moreover, the
trial court was free to believe that Ramos first accused Araguz of being
A.D.M.’s father when the OAG filed its paternity action against him.[21]  Until Ramos
revealed that Araguz was possibly A.D.M.’s father, appellants had no reason to
commence a paternity suit against Araguz.[22] 
Therefore, because the statute of limitations was enacted before appellants’
cause of action accrued, it did not impair a vested right.  We overrule
appellants’ second issue.

V.        Denial of Paternity Test

            By their final issue, appellants contend that
the trial court abused its discretion by denying their request for genetic
testing of Araguz.  Appellants premise this argument on the assumption that
section 160.607(a) did not bar their cause of action against Araguz.  However,
we have already concluded that section 160.607(a) limitations period barred
appellants’ cause of action against Araguz.  Therefore, we overrule appellants’
final issue.

VI.       Conclusion

            We affirm the trial court’s judgment.[23]

 

___________________     

Rogelio Valdez

                                                                                                Chief
Justice

 

Delivered and filed the 

4th day of August, 2011.

 

 









[1]
In her brief, Ramos “adopts all issued raised by the [OAG] in its appellate
briefing and incorporates by reference as if fully copied and set forth at
length.”





[2]
The petition filed by the OAG against Martinez is not in the record.





[3]
Although the OAG’s motion is included in the clerk’s record, it is not file
date stamped.





[4]
The OAG filed a motion in support of Ramos’s motion for parentage testing.





[5]
The trial court admitted petitioner’s exhibit number five, a warranty deed for
the house Martinez and Ramos purchased.  Ramos did not use Martinez’s name when
she signed the deed.





[6]
Martinez testified by oral deposition.





[7]
According to Martinez, a few days before he took the blood test, Ramos told him
that there was a possibility that he was not A.D.M.’s biological father.





[8]
Martinez testified that the results of the genetic testing did not affect his
feelings for A.D.M., and he would be unable to “cut off” the relationship he
has with her.





[9]
Ramos did not enroll any children at Aurora’s daycare.





[10]
Ramos claimed that she told Aurora that A.D.M. was Araguz’s daughter and that
Aurora visited A.D.M. when she was a baby.





[11]
Ramos claimed that the picture was taken at one of A.D.M.’s birthday parties.





[12]
Ramos claimed that after A.D.M. was born, she told Julissa that A.D.M. was
Araguz’s daughter and that Julissa attended A.D.M.’s birthday party.





[13]
In a footnote in their brief, without a clear and concise argument with
citation to appropriate authority, appellants also argue that the trial court’s
finding of fact that Ramos and Martinez “lived together continuously from 1988
until 1999” is contrary to the evidence.           We conclude that this issue
is not adequately briefed.  See Tex.
R. App. P. 38.1(i).  However, as stated above, the cohabitation need not
be continuous in order for a couple to enter into a common law marriage.  See
Bolash v. Heid, 733 S.W.2d 698, 699 (Tex. App.—San Antonio 1987, no writ). 
Therefore, even if Ramos and Martinez lived together “on and off” as Martinez
testified, the trial court could have still found that Ramos and Martinez
entered into a common law marriage if there was evidence that they agreed to be
married and held out to others that they were married.  See id.





[14]
In one sentence in her brief, Ramos generally states that she is challenging
all of the trial court’s findings of fact and conclusions of law, except for
findings of fact one through three.  However, Ramos has not specifically stated
in her brief how the evidence is insufficient to support each of the remaining
findings of fact.  Therefore, we conclude that she has not adequately briefed
those issues.  See Tex. R. App.
P. 38.1(i).





[15]
The OAG filed its suit against Araguz when A.D.M. was six years’ old on
November 29, 2001.  According to Araguz, Ramos was a party to this lawsuit because
she had filed an answer.  However, on April 17, 2006, Ramos filed a petition in
intervention seeking to establish that Araguz was A.D.M.’s father.





[16]
Ramos testified that she informed A.D.M. in 2001 that Martinez was not her
biological father.  A.D.M. was approximately six years old.





[17]
Appellants argue that because there was an adjudication that Martinez was not
A.D.M.’s father by another court, A.D.M. remains fatherless.  However, that
adjudication was caused by appellants’ action of requesting a legally
unnecessary paternity test.  Because Martinez did not challenge his paternity
of A.D.M., without that test, he would have been found to be A.D.M.’s presumed
father; and therefore, legally her father.  See Tex. Fam. Code Ann. § 160.204 (West 2008).





[18]
See nccusl.org, Why States Should Adopt UPA, available at http://www.nccusl.org/Narrative.aspx?title=Why
States Should Adopt UPA (last visited July 18, 2011).





[19]
Although paternity testing has revealed that Martinez is not A.D.M’s biological
father, there are many cases, such as in adoption, where a person who is not
the biological parent assumes that role.  In this case, at the time suit was
filed against Araguz, Martinez had assumed the role of A.D.M.’s father for six
years.





[20]
“Paternity statutes reflect society’s belief that a father should be legally
responsible for the support of both his legitimate and illegitimate offspring.
Paternity statutes are designed to protect the illegitimate child’s financial
well-being, to determine the natural father’s responsibility for the care and
maintenance of his illegitimate children, to establish a legal parent-child
relationship between the illegitimate child and his father, to assist the
mother in fulfilling her child support obligations, and to convert the natural
father’s moral obligation into a legal one.”  Wells, Statutes of Limitations
In Paternity Proceedings: Barring an Illegitimate’s Right to Support, 32 Am.U.L.Rev.
567, 571 (1983).





[21]
The trial court may also not have believed Ramos when she stated that she had
sex with Araguz at the time she conceived A.D.M.





[22]
We note that appellants could not have relied on the former statute of
limitations allowing a party to sue for paternity until the child reached the
age of majority because, the only claim made during the child’s first six years
of life was that Martinez was A.D.M.’s father.





[23]
Despite its finding that the OAG did not have standing to initiate suit against
Araguz, the trial court did not dismiss the OAG’s cause of action, proceeded
with the case as if all parties were properly before it, and held a trial on
the merits.  See DaimlerChrysler Corporation v. Inman, 252 S.W.3d 299,
304 (Tex. 2008) (providing that when a plaintiff lacks standing, the proper
resolution is to dismiss the lawsuit.).  In view of the fact that the trial
court proceeded with the case with all parties before it, we need not address
appellants’ third issue that the trial court erred in its finding that the OAG
did not have standing to initiate the suit against Araguz because it is not
dispositive of this appeal.  See Tex.
R. App. P. 47.1.