

# NUMBER 13-09-00677-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

## IN THE INTEREST OF A. D. M., A CHILD

On appeal from the 107th District Court
of Cameron County, Texas.

## MEMORANDUM OPINION

**Before Chief Justice Valdez and Justices Rodriguez and Vela
Memorandum Opinion by Chief Justice Valdez**

Appellants, the Office of the Attorney General ("OAG") and Darlene Ramos, appeal the trial court's order adjudicating that appellee, Leobardo Araguz, is not the father of Ramos's child, A.D.M. By four issues, which we have renumbered and reorganized, appellants contend that: (1) the evidence is legally and factually insufficient to show that A.D.M. had a presumed father at the time Araguz asserted his limitations defense; (2) assuming A.D.M. had a presumed father, application of the statute of limitations in section 160.607(a) of the family code in this case violates the

Texas constitution's prohibition on retroactive laws; (3) the OAG had the authority and standing to bring a lawsuit to adjudicate A.D.M.'s parentage; and (4) the trial court should have granted their motions for paternity testing.[1] By two sub-issues, Ramos contends that the trial court erred in concluding that Araguz is not A.D.M.'s father and that she is not entitled to attorney's fees. We affirm.

## I.    PROCEDURAL HISTORY

On August 26, 1995, Ramos gave birth to A.D.M. On November 1, 2001, the OAG filed suit in the 357th Judicial District Court of Cameron County, Texas against Joe Martinez, claiming that he was A.D.M.'s father and requesting child support.[2] Martinez submitted to genetic testing requested by the OAG, and on November 5, 2001, the results established that Martinez is not A.D.M.'s biological father. The OAG then filed suit against Araguz in the 107th Judicial District Court of Cameron County, Texas on November 29, 2001 claiming that he was A.D.M.'s father. On January 3, 2002, the 357th District Court concluded that Martinez is not A.D.M.'s father and signed an agreed order dismissing with prejudice the OAG's paternity suit against Martinez.

The OAG then filed a motion for order of parentage testing seeking to establish that Araguz is A.D.M.'s biological child.[3] On April 2, 2002, Araguz filed his first amended original answer raising the statute of limitations as an affirmative defense to the OAG's cause of action. The trial court held a hearing on the OAG's motion and then

---

[1] In her brief, Ramos "adopts all issued raised by the [OAG] in its appellate briefing and incorporates by reference as if fully copied and set forth at length."

[2] The petition filed by the OAG against Martinez is not in the record.

[3] Although the OAG's motion is included in the clerk's record, it is not file date stamped.

2

denied it. The OAG filed a motion for rehearing, which the trial court denied after a hearing.

On April 17, 2006, Ramos filed a document entitled "Petition for Intervention" seeking to establish Araguz's status as A.D.M.'s biological father. Ramos filed a motion for parentage testing, which the trial court denied.[4] Appellants then filed a petition for writ of mandamus asking this Court to order the trial court to grant genetic testing of Araguz. After this Court denied appellants' petition for writ of mandamus, the 107th District Court held a bench trial. The OAG presented the testimony of among others, Araguz, Ramos, Martinez, Julissa Araguz, Aurora Quiroz, and Francisco Quiroz; Araguz presented the testimony of Abel Toscano III.

After hearing the evidence, the trial court signed an order stating that Araguz "has not been proven to be the father of the child [A.D.M.]." Appellants requested findings of fact and conclusions of law. The trial court entered the following pertinent findings of fact:

. . . .

4. This suit was filed against [Araguz] when the child was 6 years and 3 months old.

5. This suit was filed against [Araguz] after the enactment of § 160.607(a) of the Texas Family Code which provides that a proceeding to adjudicate the parentage of a child having a presumed father shall be commenced not later than the fourth anniversary of the date of the birth of the child.

6. At the time of the conception of the child, [A.D.M.], Respondent [Ramos], mother of the child, was married to [Martinez] in accordance with § 2.401 of the Texas Family Code.

---

[4] The OAG filed a motion in support of Ramos's motion for parentage testing.

3

7. At the time of the birth of the child, [A.M.D.], Respondent [Ramos], mother of the child was married to [Martinez] in accordance with § 2.401 of the Texas Family Code.

8. At the time of the filing of this suit against Respondent, [Araguz], [Martinez] was the presumed father of the child in accordance with § 160.204 of the Texas Family Code.

9. During the probable time of conception of the child, the presumed father, [Martinez], and the mother of the child, [Ramos] lived together and engaged in sexual intercourse with each other.

10. At the time of the birth of the child, [Ramos] mother of the child, named the child [A.D.M.], giving the child the last name of [Martinez].

11. At all times after the birth of the child and up to the filing of this suit against Respondent, [Araguz], both the mother of the child, [Ramos], and the father of the child, [Martinez], represented to others that the child was the child of [Martinez].

12. At all times after the birth of the child and up to the filing of this suit against Respondent, [Araguz], [Ramos] and [Martinez] represented to others that [A.D.M.] was their second child together, their first child being [A.B.R.], born June 29, 1988.

13. [Ramos] and [Martinez] lived together as husband and wife continuously from 1988 until 1999.

14. No divorce proceeding or judicial, administrative, or other legal proceeding was instituted by either [Ramos] or [Martinez] to end or disclaim their marriage prior to this suit being filed against [Araguz].

15. [Araguz] was not a party to nor given any notice of any divorce proceeding or judicial administrative, or other legal proceeding instituted by either [Ramos] or [Martinez] to end or disclaim their marriage prior to 2009 or prior to any such proceeding being finalized.

. . . .

18. The limitations period set out in § 160.607(a) barred the filing of this suit on November 29, 2001 against Respondent, [Araguz] when the child the subject of this suit was over 6 years old at the time of the filing of this suit.

4

19. [Martinez's] presumption of paternity of the child the subject of this suit could only be rebutted by an adjudication of parentage in accordance with Subchapter G if Chapter 160 of the Texas Family Code or the filing of a valid denial of paternity by a presumed father in conjunction with the filing by another person of a valid acknowledgment of paternity as provided by § 160.305 of the Texas Family Code.

20. No filing of a valid denial of paternity by [Martinez] in conjunction with the filing by another person of a valid acknowledgment of paternity as provided by § 160.305 of the Texas Family Code was ever filed regarding the child the subject of this suit.

21. Pursuant to § 160.602 of the Texas Family Code, the time period to file suits adjudicating the parentage of a child having a presumed father set out in § 160.607 of the Texas Family Code also applies to suits brought by the support enforcement agency or another government agency authorized by other law.

22. The STATE OF TEXAS, the support enforcement agency, brought suit to adjudicate parentage of the child [A.D.M.] against [Martinez] the presumed father of the child after the 4th birthday of the child and after the enactment of § 160.607 of the Texas Family Code, in Cause No. 2001-11-4703-E in the 357th District Court of Cameron County, Texas.

23. Respondent [Martinez], the presumed father of the child, in Cause No. 2001-11-4703-E in the 357th District Court of Cameron County, Texas, was not served in such suit until December 12, 2001, and such suit was still pending and had not been adjudicated at the time of the filing of this suit by the State of Texas against Respondent [Araguz] on November 29, 2001.

. . . .

31. At the time of the institution of the suit by the STATE OF TEXAS against Respondent [Araguz] in this cause on November 29, 2001, [Martinez] was the presumed father of the child, [A.D.M.], and there was an established father-daughter relationship between [Martinez] and [A.D.M.], and an established grandparent-grandchild relationship between [Martinez's] parents and the child [A.D.M.].

32. [Martinez's] parentage regarding the child [A.D.M.] was not adjudicated until January 3, 2002, after the institution of this suit against Respondent [Araguz] on November 29, 2001.

5

33. Pursuant to § 160.204(b), [Martinez's] presumption of paternity of the child [A.D.M.] was not rebutted until January 3, 2002.

34. This suit to adjudicate parentage was filed by the STATE OF TEXAS against Respondent [Araguz] prior to the adjudication of [Martinez's] parentage of the child [A.D.M.].

35. This suit to adjudicate parentage was filed by the STATE OF TEXAS against Respondent [Araguz] prior to the adjudication of [Martinez's] parentage of the child [A.D.M.] was barred by § 160.607 of the Texas Family Code.

36. This suit to adjudicate parentage was filed by the STATE OF TEXAS against Respondent [Araguz] without authority of law.

37. The State of Texas had no standing to file this suit to adjudicate parentage against Respondent [Araguz] on November 29, 2001.

38. Respondent, [Ramos], had a history and pattern of lying regarding the identity of the biological father of [A.D.M.].

39. Respondent, [Ramos's] testimony at trial was not credible.

40. Any finding of fact that is a conclusion of law shall be deemed a conclusion of law.

The trial court made the following conclusions of law:

1. Respondent [Araguz] is not the father of the child [A.D.M.].

2. This Court is not barred by any other fact finding or judgment issued in any other proceeding by another court in another cause instituted by [Ramos] or [Martinez] after the institution of this cause.

This appeal ensued.

## II. THE EVIDENCE

### A. Araguz

On direct examination by the OAG, Araguz admitted that he had "sexual relations" with Ramos on approximately ten occasions; however, he did not remember when those "sexual relations" occurred or if he had sex with her in 1994. Araguz did not recall whether he used contraception when he had sex with Ramos.

6

On cross-examination by Ramos's attorney, Araguz stated that he was not denying the possibility that he is A.D.M.'s father. Araguz agreed that he did not know of any other person who could possibly be A.D.M.'s father besides himself. Araguz acknowledged that he did not have a reason to agree or disagree with the allegation that he had sex with Ramos in 1994 because he could not recall the dates he had sex with her.

Araguz testified that when he had a sexual relationship with Ramos, Ramos told him that she was married to Martinez. Araguz testified that during the entire time of his relationship with Ramos, she lived with Martinez. Araguz believed that Ramos was committing adultery with him.

## B. Ramos

On direct examination by the OAG, Ramos testified that she lived with Martinez "on and off" from 1989 until 1999. On cross-examination by her attorney, Ramos claimed that the longest period of time she and Martinez lived together was one year.

According to Ramos, she only had sex with Araguz and Martinez during "the period of possible conception," which was approximately in November 1994. However, Ramos claimed she always believed that Araguz was A.D.M.'s father. Ramos stated that A.D.M. resembles Araguz because she has "his height, his eyebrows, his nose, lips, the way she stands, and she's very athletic." According to Ramos, A.D.M. plays basketball, volleyball, soccer, and softball; A.D.M. would like to play football.

On cross-examination by Araguz's attorney, Ramos admitted that although at the time A.D.M. was born she did not believe Martinez was A.D.M.'s father, she told Martinez that he was the father. Ramos testified that genetic testing established that Martinez is not A.D.M.'s biological father. Ramos acknowledged that there was a court

7

order stating that Martinez was not A.D.M.'s father. Ramos did not provide a name for A.D.M.'s father on her birth certificate—it was left blank. However, Ramos did give A.D.M., Martinez's last name.

Ramos stated that although she referred to her relationship with Martinez as a common law marriage, she never intended to be married to Martinez. Ramos explained that she thought her relationship with Martinez was a common law marriage because they lived together, they bought a house together, and "people would say that was considered common-law. . . ."[5] Ramos and Martinez did not file for a divorce when the relationship ended. Ramos stated that she did not use Martinez's name on any legal documents and she never filed a tax return with Martinez. Ramos claimed that she did not have a wedding ring from Martinez and that they did not celebrate an anniversary.

On cross-examination by Araguz's attorney, Ramos testified that "sometimes" she and Martinez told people they were common-law married and she introduced him as her husband and he introduced her as his wife. Although Ramos denied telling other people that Martinez was A.D.M.'s father, she admitted that she "represented" to Martinez's parents that A.D.M. was their granddaughter. Ramos agreed that she represented herself as Martinez's common law wife from 1989 until 1999 when the relationship ended.

## C.    Martinez[6]

Martinez testified that he and Ramos lived together for approximately seven to nine years; however, because the relationship was "off and on," Martinez claimed

---

[5] The trial court admitted petitioner's exhibit number five, a warranty deed for the house Martinez and Ramos purchased. Ramos did not use Martinez's name when she signed the deed.

[6] Martinez testified by oral deposition.

8

"[t]here was never a consistent year between [the two]." According to Martinez, he and Ramos only discussed getting married when they first began their relationship; but they never discussed marriage again because of the many periods of separation. Martinez stated that Ramos did not use Martinez as her name, and when they signed the deed to the house they purchased together, she used Ramos. According to Martinez, the couple filed separate individual tax returns, and when the relationship ended they did not seek a divorce.

Martinez testified on cross-examination by Araguz's attorney that he sometimes introduced Ramos as his wife and she sometimes introduced him as her husband. When asked if the couple had decided that they were married or not married, Martinez replied:

> We just assumed that in the State of Texas that we would be common-law, you know. That's—we assumed—we were told by various people that if you lived together, you would be considered common-law married; so that's what we based it on. But as far as marriage, going back to that question, only in the earlier part of our relationship.

Martinez stated that Ramos did not change her name because they were under the impression that she could not change her name unless they were married by the church or the justice of the peace. Martinez testified that if he had known that Ramos was allowed to legally change her name to his, there is a possibility the situation would have been different; and he did not "see" a reason why Ramos would not have changed her name to Martinez. According to Martinez, there was a possibility that the couple would have filed joint tax returns if he had known they did not need a document from a church or justice of the peace stating they were married. Martinez did not know that a divorce was required if a couple is considered to be in a common law marriage.

9

Martinez testified that Ramos told him that he was A.D.M.'s father and that he believed that A.D.M. was his biological daughter until October 29, 2001, when the results of a genetic test revealed he was not biologically related to A.D.M.[7] According to Martinez, the OAG requested genetic testing, and he never requested it. The OAG agreed to dismiss its suit against Martinez with prejudice.[8]

## D.   Aurora Quiroz

Aurora, Araguz's mother, testified that she met Ramos when Ramos visited Aurora's daycare because Ramos was considering enrolling her child there.[9] Aurora stated that she does not have a relationship with Ramos and that she had not seen A.D.M. until she was subpoenaed to testify in this case. Aurora said that she had never attended any events or parties held for A.D.M. Aurora stated that she has never told anyone that A.D.M. is Araguz's daughter and that no one has ever told her that A.D.M. is Araguz's daughter.[10] Aurora did not remember if she attended an event for A.D.M. depicted in petitioner's exhibit number four, but she did recognize Julissa, her daughter, in the picture.[11] According to Aurora, she first discovered that A.D.M. existed when this suit was filed against Araguz. When asked if she attended A.D.M.'s first and second birthday parties, Aurora replied that she did not remember.

## E.   Francisco Quiroz

---

[7] According to Martinez, a few days before he took the blood test, Ramos told him that there was a possibility that he was not A.D.M.'s biological father.

[8] Martinez testified that the results of the genetic testing did not affect his feelings for A.D.M., and he would be unable to "cut off" the relationship he has with her.

[9] Ramos did not enroll any children at Aurora's daycare.

[10] Ramos claimed that she told Aurora that A.D.M. was Araguz's daughter and that Aurora visited A.D.M. when she was a baby.

[11] Ramos claimed that the picture was taken at one of A.D.M.'s birthday parties.

Francisco, Araguz's stepfather, testified that he did not know Ramos and that he had not met her in the past. Francisco stated that he did not know A.D.M. and that he had not seen her until the trial began. When asked if he had attended a birthday party for A.D.M. and if he had ever been to Martinez's home, Francisco replied that he did not remember. Francisco stated that he did not want to know if A.D.M. was his granddaughter.

On cross-examination, Ramos's attorney asked what Araguz had said concerning the lawsuit. The following exchange occurred:

[Francisco]: That he was being sued because that probably this lady's child was his.

[Ramos's counsel]: So[,] he expressed to you that he believed that probably this baby was his daughter?

[Francisco]: That's what I answered you.

. . . .

[Ramos's counsel]: There was an admission to you that he was probably the father, correct?

[Francisco]: Well, I don't look at it that way.

[Ramos's counsel]: Well, he said he was probably the father, correct?

[Francisco]: Well, that's one of the things—that's one of the reasons that we're here, aren't we?

[Ramos's counsel]: No, sir. I'm asking you to make sure we understood your testimony that you said—that [Araguz] told you that he was probably the father of the little girl.

[Francisco]: That's what I told you before.

On cross-examination by Araguz's attorney, Francisco stated that Araguz had not told him that he was A.D.M.'s father, and he claimed that he misunderstood the questions previously asked by Ramos's attorney.

11

**F.    Julissa Araguz**

Julissa, Araguz's sister, testified that Ramos was her friend from "many years ago" and that she did not remember how they met. Julissa did not remember how often she talked to Ramos, if she went out with Ramos or anything that she did with Ramos. Julissa recalled that she was pregnant with her son when Ramos was pregnant with A.D.M. However, Julissa could not remember if they ever discussed their pregnancies with each other.

Julissa stated that she was unaware of Ramos's and Araguz's sexual relationship and that Ramos never told her about their relationship. Julissa stated that Ramos did not tell her that Araguz was A.D.M.'s father.[12] Julissa said that Ramos told her that Ramos had a husband named Joe and children. Julissa did not remember Joe's last name.

Julissa believed that it was possible that she visited A.D.M. after she was born and that she attended A.D.M.'s birthday party; but Julissa could not remember doing so. Julissa stated that she never acknowledged A.D.M. as being Araguz's child and never told anyone that A.D.M. was his child. No one ever told Julissa that A.D.M. was Araguz's child, and she never discussed the issue with Ramos or Araguz. Julissa stated that she never talked to her parents or Araguz about the case. When asked if she wanted to know if A.D.M. was Araguz's daughter, Julissa responded, "It doesn't matter."

### III.    LEGAL AND FACTUAL SUFFICIENCY

---

[12] Ramos claimed that after A.D.M. was born, she told Julissa that A.D.M. was Araguz's daughter and that Julissa attended A.D.M.'s birthday party.

12

By the first issue, appellants contend that Martinez was not A.D.M.'s presumed father. Specifically, appellants argue that (1) the evidence is legally and factually insufficient to support a finding that Ramos and Martinez had a common law marriage and (2) even if at one time Martinez was A.D.M.'s presumed father, that presumption had been rebutted and or destroyed by genetic testing when Araguz asserted his statute of limitations defense; therefore, the trial court "should have rejected it [Araguz's statute of limitations defense]."

## A.    Standard of Review

We may sustain a challenge to the legal sufficiency of the evidence only when: (1) the record discloses a complete absence of evidence of a vital fact; (2) the court is barred by rule of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence provided to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of a vital fact. *City of Keller v. Wilson*, 168 S.W.3d 802, 810-11 (Tex. 2005). "[W]hen the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is less than a scintilla and, in legal effect, is no evidence." *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004). But more than a scintilla of evidence exists if the evidence rises to a level that would enable reasonable and fair-minded people to differ in their conclusions. *Id.*

In our legal sufficiency review, we review the evidence in the light favorable to the finding, crediting favorable evidence if a reasonable fact-finder could and disregarding contrary evidence unless a reasonable fact-finder could not. *City of Keller*, 168 S.W.3d at 807. The final test for legal sufficiency is whether the evidence

13

presented at trial would enable reasonable and fair-minded people to make the finding under review. *Id.* at 827.

When reviewing the evidence for factual sufficiency, we consider and weigh all of the evidence in a neutral light and conclude that the finding is not supported by sufficient evidence only if the finding is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986) (per curiam). We must "detail the evidence relevant to the issue" and "state in what regard the contrary evidence greatly outweighs the evidence in support of the verdict." *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001) (per curiam).

## B.     Common Law Marriage

A common law marriage exists in Texas if the parties: (1) agreed to be married; (2) lived together in Texas as husband and wife subsequent to the agreement to be married; and (3) represented to others in Texas that they were married. *See* TEX. FAM. CODE ANN. § 2.401(a)(2) (West 2006). A common law marriage does not exist until the concurrence of all three elements. *Winfield v. Renfro*, 821 S.W.2d 640, 645 (Tex. App.—Houston [1st Dist.] 1991, writ denied). An agreement to be married requires that "the parties intended to have a present, immediate, and permanent marital relationship and that they did in fact agree to be husband and wife." *Eris v. Phares*, 39 S.W.3d 708, 714 (Tex. App.—Houston [1st Dist.] 2001, pet. denied). The agreement to be married may be established by direct or circumstantial evidence. *Russell v. Russell*, 865 S.W.2d 929, 933 (Tex. 1993). The conduct of the parties as well as proof of cohabitation and representations to others may constitute circumstantial evidence of an agreement to be married depending upon the facts of the case. *Id.* Cohabitation need not be continuous. *See Bolash v. Heid*, 733 S.W.2d 698, 699 (Tex. App.—San Antonio

14

1987, no writ); *see also McCaskill v. McCaskill*, No. 13-08-00122-CV, 2009 Tex. App. LEXIS 7998 (Tex. App.—Corpus Christi Oct. 15, 2009, pet. denied) (mem. op.). Whether a common law marriage exits is a question of fact. *Weaver v. State*, 855 S.W.2d 116, 120 (Tex. App.—Houston [14th Dist.] 1993, no pet.).

On appeal, appellants challenge the first element of a common law marriage arguing that the evidence was legally and factually insufficient to support the trial court's finding that Ramos and Martinez agreed to be married. Appellants do not argue that Ramos and Martinez failed to hold themselves out as a married couple.[13] *See* TEX. FAM. CODE ANN. § 2.401.

In this case, there was circumstantial evidence that Ramos and Martinez agreed to be married because both parties testified that they had cohabitated and had held out to others that they were husband and wife. Although appellants emphasize that Ramos did not change her last name to Martinez and that the couple did not file tax returns together or sign a deed as husband and wife, Martinez explained that they were under the impression that a couple married by common law could not file tax returns together and that Ramos could not change her name to Martinez. Martinez also stated that had the couple known that a common law marriage was valid in Texas, they would have filed their tax returns together and that Ramos would have changed her name to Martinez. It appears that the couple were not aware that a common law marriage is a

---

[13] In a footnote in their brief, without a clear and concise argument with citation to appropriate authority, appellants also argue that the trial court's finding of fact that Ramos and Martinez "lived together continuously from 1988 until 1999" is contrary to the evidence. We conclude that this issue is not adequately briefed. *See* TEX. R. APP. P. 38.1(i). However, as stated above, the cohabitation need not be continuous in order for a couple to enter into a common law marriage. *See Bolash v. Heid*, 733 S.W.2d 698, 699 (Tex. App.—San Antonio 1987, no writ). Therefore, even if Ramos and Martinez lived together "on and off" as Martinez testified, the trial court could have still found that Ramos and Martinez entered into a common law marriage if there was evidence that they agreed to be married and held out to others that they were married. *See id.*

15

valid form of marriage in Texas; however, whether the couple believed that their marriage was valid or invalid does not negate the fact that there was evidence presented that they agreed to enter into a common law marriage. Therefore, viewing the evidence in the light most favorable to the trial court's finding, we conclude that the evidence was legally sufficient. *See City of Keller*, 168 S.W.3d at 807. Moreover, weighing all of the evidence in a neutral light we cannot conclude that the finding is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *See Cain*, 709 S.W.2d at 176. Accordingly, we conclude that evidence was legally and factually sufficient to establish that Ramos and Martinez agreed to be married. Thus, the trial court's finding that at the time A.D.M. was conceived, Ramos and Martinez were married is supported by the evidence. *See* TEX. FAM. CODE ANN. § 2.401.

## C. Presumed Father

Furthermore, there exists a presumption of paternity if a man is married to the mother of the child and the child is born during the marriage. *Id.* § 160.204(a) (West 2008). This presumption legally establishes the father-child relationship between the man and child. *Id.* at § 160.201(b)(1) (West 2008). A "presumed father" is, by operation of law under section 160.204, "recognized as the father of the child until that status is rebutted or confirmed in a judicial proceeding." *Id.* at § 160.102(13) (West 2008); *In re S.C.L.*, 175 S.W.3d 555, 557 (Tex. App.—Dallas 2005, no pet.).

As set out above, the trial court's finding that Ramos and Martinez were married when A.D.M. was born is supported by the evidence. Therefore, viewing the evidence appropriately, the evidence is sufficient to support a finding that Martinez was A.D.M.'s presumed father when appellants commenced the cause against Araguz. We overrule appellants' first issue.

16

**D.      Rebuttal of Presumption**

Appellants also argue that the presumption that Martinez is A.D.M.'s father had been rebutted when Araguz asserted his statute of limitations defense. Therefore, according to appellants, the statute of limitations could not have barred their cause of action against Araguz. We disagree.

Section 160.607 of the family code bars the commencement of a paternity cause of action four years after the child's birth if the child has a presumed father. *See* TEX. FAM. CODE ANN. § 160.607 (West 2008). When appellants commenced the cause of action, there had been no adjudication with respect to Martinez's paternity. Therefore, the trial court found that at the commencement of appellants' cause of action Martinez was A.D.M.'s presumed father. Viewing the evidence in the light most favorable to the trial court's finding, we cannot conclude that the evidence was legally insufficient to support the trail court's finding, *see City of Keller*, 168 S.W.3d at 807; and viewing the evidence in a neutral light, we cannot conclude that the finding is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *See Cain*, 709 S.W.2d at 176. Moreover, because appellants commenced the paternity cause of action against Araguz outside the limitations period, we cannot conclude, as appellants request, that the trial court "should have rejected [Araguz's statute of limitations defense]."

**E.      Sub-issues**

17

By a sub-issue, Ramos contends that the evidence was legally and factually insufficient to show that Araguz is not A.D.M.'s father; therefore, she was entitled to attorney's fees.[14] We disagree.

The trial court found that Ramos was not credible; and therefore, presumably it did not believe her assertions that she only had sex with Araguz and Martinez when A.D.M. was conceived. Although Araguz admitted that it was possible that he was A.D.M.'s father, this evidence is so weak as to do no more than create a mere surmise or suspicion of its existence. *Ridgway*, 135 S.W.3d at 601. Therefore, it is less than a scintilla of evidence to support a conclusion that Araguz is A.D.M.'s biological father. *See id.* After viewing the evidence in the light most favorable to the trial court, we conclude the evidence was legally sufficient to support the trial court's finding that Araguz is not A.D.M.'s biological father. *See City of Keller*, 168 S.W.3d at 807. Furthermore, after weighing all of the evidence in a neutral light, we cannot conclude that the finding is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *See Cain*, 709 S.W.2d at 176. Therefore, the evidence was factually sufficient to support the trial court's finding that Araguz is not A.D.M.'s father.

Having concluded that the evidence was legally and factually sufficient to support the trial court's finding that Araguz is not A.D.M.'s father, to the extent Ramos is arguing that she is entitled to attorney's fees because the evidence supported a finding that Araguz is A.D.M.'s biological father, we overrule Ramos's sub-issue.

## IV. RETROACTIVE LAW

---

[14] In one sentence in her brief, Ramos generally states that she is challenging all of the trial court's findings of fact and conclusions of law, except for findings of fact one through three. However, Ramos has not specifically stated in her brief how the evidence is insufficient to support each of the remaining findings of fact. Therefore, we conclude that she has not adequately briefed those issues. *See* TEX. R. APP. P. 38.1(i).

18

By the second issue, appellants' contend that their paternity lawsuit is not barred by section 160.607(a) of the Texas Family Code stating that "a proceeding brought . . . to adjudicate the parentage of a child having a presumed father shall be commenced no later than the fourth anniversary of the date of the birth of the child." *See* TEX. FAM. CODE ANN. § 160.607(a) (Vernon 2008). Section 160.607(a) was signed by the governor on June 14, 2001, and it became effective immediately. A.D.M. was five when the statute became effective; therefore, it was impossible for A.D.M. to comply with the limitations period. Appellants argue, therefore, that 160.607(a) is unconstitutionally retroactive, as applied to A.D.M., because the statute took effect immediately and the legislature failed to provide a reasonable time for them to file the lawsuit on A.D.M.'s behalf. *See* TEX. CONST. art. I § 16.

Article I, section 16 of the Texas Constitution states that "[no] bill of attainder, ex post facto law, retroactive law, or any law impairing the obligation of contracts, shall be made." TEX. CONST. art. I, § 16. The presumption in Texas is against retroactivity, which fulfills two objectives as stated by the Texas Supreme Court: (1) to protect the people's reasonable, settled expectations; and (2) to protect against the abuses of legislative power. *Robinson v. Crown Cork & Seal Co., Inc.*, 335 S.W.3d 126, 139 (Tex. 2010) (citing *Landgraf v. USI Film Products*, 511 U.S. 244, 265 (1994)). Although a statute of limitations is procedural and generally applies retroactively, it will not be given retroactive effect if doing so destroys or impairs a right that vested before the effective date of the statute. *Id.* at 141; *In re K.N.P.*, 179 S.W.3d 717, 720 (Tex. App.—Fort Worth 2005, pet. denied).

Although the courts of this State have analyzed whether a statute is unconstitutionally retroactive by determining whether the law impairs vested rights—the

19

vested rights test—the Texas Supreme Court in its plurality opinion *Robinson v. Crown Cork & Seal Co.*, attempted to abolish the vested rights test. *Robinson,* 335 S.W.3d at 147. In that case, the court stated that

> [n]o bright-line test for unconstitutional retroactivity is possible. Rather, in determining whether a statute violates the prohibition against retroactive laws in article I, section [16] of the Texas Constitution, courts must consider three factors in light of the prohibition's dual objectives: the nature and strength of the public interest served by the statute as evidenced by the Legislature's factual findings; the nature of the prior right impaired by the statute; and the extent of the impairment. The perceived public advantage of a retroactive law is not simply to be balanced against its relatively small impact on private interests, or the prohibition would be deprived of most of its force. There must be a compelling public interest to overcome the heavy presumption against retroactive laws.

*Id.* at 145-46. In *Robinson*, the majority of the court agreed to reverse the lower court's judgment, concluding that the complained-of statute was not unconstitutionally retroactive; however, the justices did not agree on the proper analysis supporting reversal. *Id.* Three justices concluded that the vested rights test should be abolished while the three concurring justices applied the vested rights test. *Id.* at 147, 150-51 (Medina J., concurring) (declining to apply the vested rights test and instead applying the above factors to determine whether the complained-of statute was unconstitutionally retroactive as applied to the appellants), 151. The two dissenting justices agreed with the concurring justices that the vested rights test applied but concluded that the complained-of statute had not impaired a vested right. *Id.* at 170, 192 (Wainwright J., dissenting). Therefore, the court's opinion itself has very limited precedential value and would control the result only in identical cases. *See Univ. of Tex. Med. Branch v. York*, 871 S.W.2d 175, 176 (Tex. 1994).

In this case, we will determine whether section 160.607(a) is unconstitutionally retroactive in this case by applying both tests—the vested rights test and the *Robinson*

test. Under each test, our focus is on protecting reasonable, settled expectations and protecting against the abuses of legislative power. *Robinson*, 335 S.W.3d at 139; *see id.* at 151 (Medina J., concurring) ("Along the way, the [court's *Robinson* opinion] grapples with the nature of the underlying property interest and its impairment, ultimately concluding that the Robinsons possessed a substantial interest in a well-founded claim (dare I say a vested property right) that Chapter 149 retroactively impaired. Although the Court is reluctant to use the term 'vested rights,' preferring instead to speak of 'settled expectations,' I believe we are talking about the same thing."). And, under each test, the result of our analysis should be the same. *See Robinson*, 335 S.W.3d at 146.

We must first consider the nature of the rights claimed by appellants and section 160.607(a)'s impact on them. *See id.* At trial, Araguz admitted that it is possible that he is in fact A.D.M.'s biological father. However, Ramos admitted that although she engaged in sexual intercourse with Araguz and Martinez during the period that she conceived A.D.M., she lied to Martinez for six years by telling him that he was A.D.M's biological father. Moreover, Ramos claimed that she informed Araguz that he was possibly A.D.M.'s father when she gave birth to A.D.M.; however, she did not commence a paternity suit against him at that time and instead waited until A.D.M. was approximately ten years' old.[15] Although appellants claim that the statute of limitations has prevented the suit against Araguz, it appears the reason that no suit was filed against Araguz is because Ramos continued to deceive Martinez and everyone else

---

[15] The OAG filed its suit against Araguz when A.D.M. was six years' old on November 29, 2001. According to Araguz, Ramos was a party to this lawsuit because she had filed an answer. However, on April 17, 2006, Ramos filed a petition in intervention seeking to establish that Araguz was A.D.M.'s father.

21

concerning the identity of A.D.M.'s father.[16] Moreover, the trial court found that Ramos's testimony was not credible. Therefore, it may have disbelieved her when she stated that she informed Araguz that he was A.D.M.'s father when the child was born.

The purpose of a statute of limitations in cases where a child has a presumed father is to avoid the severance of the parent-child relationship between the child and the presumed father—the psychological father. In this case, Martinez did not challenge his paternity of A.D.M. and at the hearing stated that he still considers A.D.M. to be his daughter—although not biological—because there was a strong parent-child bond. According to Martinez, his bond with A.D.M. was still so strong he had not informed his parents that A.D.M. was not his biological daughter. A.D.M. had an established father-daughter relationship with Martinez—her presumed father. The fact that the OAG required a paternity test of Martinez despite the fact that Martinez had never challenged his paternity of A.D.M. created the current situation. In fact, Martinez testified that he did not request the paternity test. The reason that the OAG decided to get a paternity test of Martinez is unknown.

Legally, there is a presumption that a man is the child's father, regardless of biology, if he was married to the mother of the child and the child was born during that marriage. *See* TEX. FAM. CODE ANN. § 160.204. Martinez was married to Ramos when A.D.M. was born—thus, he was A.D.M.'s legal father. *See id.* The family code does not require a paternity test in cases where a child has a presumed father. *See id.* Therefore, considering the nature of the right that the OAG and Ramos are attempting to assert—the right to determine the identity of A.D.M.'s father—we conclude that

---

[16] Ramos testified that she informed A.D.M. in 2001 that Martinez was not her biological father. A.D.M. was approximately six years old.

22

section 160.607(a) would not have been significantly impacted that right because Martinez accepted responsibility for A.D.M. *See Robinson*, 335 S.W.3d at 148. It was the OAG that interfered with that relationship and caused the severance through the paternity test.[17]

We next consider the nature and strength of the public interest served by retroactive application of section 160.607(a). *See id.* at 148-49. Section 160.607(a) prevents a mother, a presumed father, or any other individual, including the biological father, from destroying the father-child relationship between a presumed father and the child. *See In re S.C.L.*, 175 S.W.3d 555, 560 (Tex. App.—Dallas 2005, no pet.). The purpose of the Uniform Parentage Act (the "UPA"), which the Texas Legislature adopted in 2001, is to protect the child involved in parentage issues.[18] The Texas legislature did not set out in its legislative history the policy reasons behind its adoption of the UPA. It is, however, apparent that Texas has an interest in protecting children involved in parentage issues and that the legislature adopted the UPA to promote the uniformity of the law among the states on issues concerning parentage. *See* TEX. FAM. CODE ANN. § 160.001 (West 2008) ("[The UPA] shall be applied and construed to promote the uniformity of the law among the states that enact [it]."). A statute of limitations in cases where the child has a presumed father usually protects a child because it preserves the established family unit. *See In re Rodriguez*, 248 S.W.3d 444, 454 (Tex. App.—Dallas

---

[17] Appellants argue that because there was an adjudication that Martinez was not A.D.M.'s father by another court, A.D.M. remains fatherless. However, that adjudication was caused by appellants' action of requesting a legally unnecessary paternity test. Because Martinez did not challenge his paternity of A.D.M., without that test, he would have been found to be A.D.M.'s presumed father; and therefore, legally her father. *See* TEX. FAM. CODE ANN. § 160.204 (West 2008).

[18] *See* nccusl.org, Why States Should Adopt UPA, *available at* http://www.nccusl.org/Narrative.aspx?title=Why States Should Adopt UPA (last visited July 18, 2011).

23

2008, orig. proceeding); *see also In re R.O.*, No. 03-04-00506-CV, 2005 Tex. App. LEXIS 2990, at *14 (Tex. App.—Austin Apr. 21, 2005, no pet.) (mem. op.).

In this case, there is an overriding public policy of preserving the A.D.M.'s family relationship with Martinez. Allowing section 160.607(a) to bar this cause of action against Araguz furthers the public interest of preserving the relationship between Martinez and A.D.M. The trial court found that when appellants commenced the suit against Araguz, Martinez was A.D.M.'s presumed father and that that presumption had not been rebutted. The evidence supported that finding. Martinez has raised A.D.M. as his own child since birth. He is the only father she has ever known.[19] Moreover, there is no guarantee that a paternity test will reveal that Araguz is in fact A.D.M.'s father; and Araguz and his family have indicated that they do not want a relationship with A.D.M.[20] Therefore, we conclude that the compelling public interest of preserving the father-child relationship between the presumed father (Martinez) and the child (A.D.M.) overcomes the heavy presumption against retroactive application of section 160.607(a) in this case. *Robinson*, 335 S.W.3d at 145-46.

We also conclude that the result is the same under the vested rights test. A statute of limitations is unconstitutionally retroactive only if it bars an existing claim. In this case, appellants did not have an existing claim against Araguz when section

---

[19] Although paternity testing has revealed that Martinez is not A.D.M's biological father, there are many cases, such as in adoption, where a person who is not the biological parent assumes that role. In this case, at the time suit was filed against Araguz, Martinez had assumed the role of A.D.M.'s father for six years.

[20] "Paternity statutes reflect society's belief that a father should be legally responsible for the support of both his legitimate and illegitimate offspring. Paternity statutes are designed to protect the illegitimate child's financial well-being, to determine the natural father's responsibility for the care and maintenance of his illegitimate children, to establish a legal parent-child relationship between the illegitimate child and his father, to assist the mother in fulfilling her child support obligations, and to convert the natural father's moral obligation into a legal one." Wells, *Statutes of Limitations In Paternity Proceedings: Barring an Illegitimate's Right to Support*, 32 Am.U.L.Rev. 567, 571 (1983).

24

160.607(a) was enacted because Ramos continued to deceive Martinez and A.D.M. concerning Martinez's status as A.D.M.'s biological father. We conclude that appellants' did not have a cause of action against Araguz until Ramos made her claim that he was possibly A.D.M.'s father. *See Robinson*, 335 S.W.3d at 171 (Wainwright, J., dissenting) ("For, at the core of the vested rights doctrine lies an extremely important principle—the constitutional retroactivity doctrine does not protect an asserted entitlement to property one does not own, and until a final judgment in a case, we do not know whether the lawsuit will prove or refute a claim to recover."). The trial court found that when appellants filed suit against Araguz, Martinez had not been adjudicated not to be A.D.M.'s father. Therefore, the presumption that Martinez was A.D.M.'s father had not been rebutted when appellants commenced their suit against Araguz.

The trial court did not believe that Ramos informed Araguz that he was A.D.M.'s father when she was born, and Ramos did not commence a paternity action against him at that time. Moreover, the trial court was free to believe that Ramos first accused Araguz of being A.D.M.'s father when the OAG filed its paternity action against him.[21] Until Ramos revealed that Araguz was possibly A.D.M.'s father, appellants had no reason to commence a paternity suit against Araguz.[22] Therefore, because the statute of limitations was enacted before appellants' cause of action accrued, it did not impair a vested right. We overrule appellants' second issue.

## V.   DENIAL OF PATERNITY TEST

---

[21] The trial court may also not have believed Ramos when she stated that she had sex with Araguz at the time she conceived A.D.M.

[22] We note that appellants could not have relied on the former statute of limitations allowing a party to sue for paternity until the child reached the age of majority because, the only claim made during the child's first six years of life was that Martinez was A.D.M.'s father.

25

By their final issue, appellants contend that the trial court abused its discretion by denying their request for genetic testing of Araguz. Appellants premise this argument on the assumption that section 160.607(a) did not bar their cause of action against Araguz. However, we have already concluded that section 160.607(a) limitations period barred appellants' cause of action against Araguz. Therefore, we overrule appellants' final issue.

## VI. CONCLUSION

We affirm the trial court's judgment.[23]

_____
ROGELIO VALDEZ
Chief Justice

Delivered and filed the
4th day of August, 2011.

---

[23] Despite its finding that the OAG did not have standing to initiate suit against Araguz, the trial court did not dismiss the OAG's cause of action, proceeded with the case as if all parties were properly before it, and held a trial on the merits. *See DaimlerChrysler Corporation v. Inman*, 252 S.W.3d 299, 304 (Tex. 2008) (providing that when a plaintiff lacks standing, the proper resolution is to dismiss the lawsuit.). In view of the fact that the trial court proceeded with the case with all parties before it, we need not address appellants' third issue that the trial court erred in its finding that the OAG did not have standing to initiate the suit against Araguz because it is not dispositive of this appeal. *See* TEX. R. APP. P. 47.1.